Nancy MARTIN, et al., Plaintiffs,

v.

Robert TAFT, Governor,
et al, Defendants.

No. C–2–89–00362.

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 19, 2002.

944

George Michael Kirkman, Ohio Legal Rights Service, Columbus, OH, for plaintiffs.

Keith Scott Mesirow, Columbus City Attorney's Office, Columbus, OH, Ann Elizabeth Henkener, Alan Paul Schwepe, Ohio Attorney General's Office, Columbus, OH, for defendants.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

### I. Overview

This class action involves the State of Ohio's role in providing services to a large and diverse population of mentally retarded and developmentally disabled persons. In essence plaintiffs seek to have these services furnished to them and the class in less restrictive, integrated community settings, as opposed to receiving services in existing institutions which plaintiffs say are segregated from the community.

Defendants do not oppose the general concept of providing community-based services, and in fact defendants and their predecessors have created programs to provide community-based services to some mentally retarded and developmentally disabled individuals in Ohio. Despite defendants efforts, however, it appears that many individuals who may qualify for community-based services remain on lengthy waiting lists, and plaintiffs contend that the waiting lists do not move at a reasonable pace as required by federal law.

So the question in this case is not whether providing additional community-based services is a good idea. Rather, the core issue is one of state sovereignty and the requirements of federal law, including the Americans with Disabilities Act ("ADA"). Defendants vigorously argue that this federal court may not impose a remedy under federal law and decide for the State when and how to allocate limited resources, including federal Medicaid funds, to make additional community-based services available.

This decision addresses two important written motions filed by the parties, but does not determine the outcome of this case. The Court does decide, however, that defendants are not immune from suit in this federal court, and that as a result

plaintiffs may proceed with most of their federal law claims against defendants. The Court also finds that plaintiffs cannot prevail on their ADA claim solely on the basis of their written motion for partial summary judgment because certain factual issues necessary to establish their ADA claim can only be decided by trial.

## II. Introduction

Plaintiffs are individual citizens of Ohio who are mentally retarded or developmentally disabled, and who live or have lived in institutions licensed or run by the State of Ohio. They represent a class of about 12,-000 people defined as "all persons in Ohio with mental retardation or developmental disabilities who are or will be in need of community housing and services which are normalized, home-like, and integrated."[1] Plaintiffs ask the Court "to enjoin the Defendants to create over a reasonably short, fixed time, not to exceed five years, the community housing and support services for each Plaintiff and class member as determined by the needs of the class member." (Third Am. Compl. (Doc. 331) at 71). Remarkably, plaintiffs allege that the community-based services they seek will cost the State of Ohio less than providing such services in institutional settings. Nonetheless, as it will be discussed below, the matter is not so simple, inasmuch as the State will continue to incur costs associated with maintaining the availability of institutional services in recognition of the fact that there will always be some individuals in need of such care.

Plaintiffs assert their claims under the public services portion (Title II) of the ADA, 42 U.S.C. § 12132 and related federal regulations, the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, Title XIX of the Social Security Act, 42 U.S.C. § 1396a, *et seq.*, and related federal regulations ("Medicaid law"), the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution, and 42 U.S.C. § 1983.

Defendants move to dismiss or, in the alternative, for summary judgment as to the third amended complaint[2] (Doc. 336), arguing primarily that plaintiffs' claims are barred under the Eleventh Amendment to the U.S. Constitution. Plaintiffs move for partial summary judgment (Doc. 364). They contend they are entitled to judgment in their favor as a matter of law on their ADA claim under the U.S. Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). *Olmstead* held that the ADA requires a state to provide community-based treatment to mentally disabled persons "when the State's treatment officials have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State, and the needs of others with disabilities." 527 U.S. at 587, 119 S.Ct. 2176.

For the reasons that follow, the Court concludes that defendants are not immune from suit under the Eleventh Amendment, and that, for the most part, plaintiffs have stated viable claims under federal law. The Court therefore denies defendants' motion to dismiss in part and grants it in part. Hence, plaintiffs may proceed with their claims.

---

1. A subclass has been defined as "all persons who, in addition to being members of the class, are or will be recipients of Medicaid."

2. Although defendants' motion refers to summary judgment in its title, summary judgment is not mentioned in the memorandum in support, and defendants' arguments appear to be purely legal in nature. The Court therefore deems defendants' motion to be one to dismiss under Fed.R.Civ.P. 12(b).

The Court also finds, however, that genuine issues of material fact exist as to whether a reasonable accommodation is available for the State to provide plaintiffs and the class the community-based services they seek, or whether the relief plaintiffs' request would fundamentally alter the nature of defendants' existing program for community-based services. The Court therefore denies plaintiffs' motion for partial summary judgment.

### III. Facts

The facts of this case are based upon submissions by the parties made within the months after plaintiffs filed their third amended complaint in April 2000. Neither side has sought leave to file additional evidentiary material, although it appears matters of concern to this case have continued to develop and change since that time.[3] Be that as it may, the Court must limit its decision to the facts as they appear in the current, albeit somewhat dated, record.

The Court set forth a detailed statement of facts in its earlier decision in this case, much of which remains applicable to the pending motions. *See Martin v. Voinovich,* 840 F.Supp. 1175, 1179–85 (S.D.Ohio 1993). For purposes of ruling on defendants' motion to dismiss, the Court accepts as true the well-pleaded facts set forth in the third amended class action complaint (Doc. 331). The Court will refer to additional facts, as appropriate, in connection with its discussion of plaintiffs' motion for partial summary judgment.

### A. Procedural history

Plaintiffs filed this action on April 27, 1989. The Court certified this case as a class action under Fed.R.Civ.P. 23 on February 5, 1990 (Doc 46).

On December 11, 1992, by agreement of the parties, the Court appointed local civil rights attorney Benson A. Wolman to serve as a mediator (Doc. 127). During the months that followed, attorneys and representatives for all parties met regularly with Mr. Wolman in a concerted attempt to settle this case. These efforts continued until about July 1993 (*see* Doc. 144).

Plaintiffs filed their second amended class action complaint on August 17, 1993. On September 23, 1993, defendants moved to dismiss (Doc. 150).

On December 14, 1993, this Court issued a comprehensive, 73–page opinion and order, granting defendants' motion to dismiss in part and denying it in part (Doc. 186). On January 5, 1994, the Court granted defendants' motion to certify an interlocutory appeal under 28 U.S.C. § 1292(b). The Court found that such an appeal would materially advance the case, which presented several novel legal issues. The Court reasoned that the United States Court of Appeals for the Sixth Circuit would be in a position to issue a definitive ruling that would be binding on this Court and would serve to guide the remainder of the proceedings in this case (Doc. 200).

The Court of Appeals agreed initially to hear the case, and during the pendency of the appeal, this Court's role in the case was limited. About 18 months later, on

---

**3.** For example, the official website of the Ohio Department of Mental Retardation and Developmental Disability includes a press release dated June 12, 2002, in which Governor Taft announced that the U.S. Department of Health and Human Services approved the State's request to increase the number of slots in the Medicaid Home and Community-based waiver program. The release indicated that the approval will allow 2000 additional individuals to participate in home-based care. Available at: http://odmrdd.state.oh.us/Includes/ PressReleases/VisionsDoc/Archives_ 2002/06–12–2002_Alert.pdf

June 12, 1995, the Court of Appeals changed its position and announced that it would not hear the appeal (Doc. 254).

Following the attempted appeal, the parties continued with their discovery and motions practice. Then, on August 30, 1996, the parties agreed to stay all discovery in the case to focus on settlement. Voluntary settlement discussions continued for almost two years. After the stay was lifted, the Court conducted a conference with attorneys representing all of the parties in December 1999. The attorneys indicated that settlement was still possible, but that negotiations were slow and difficult because several different governmental agencies were involved, including at least one federal agency that is not a party to this case. In an attempt to facilitate the process, the Court gave the parties detailed instructions requiring them to exchange formal written offers and demands on a regular basis, and to submit written status reports for review by the Magistrate Judge.

The settlement process was ultimately unsuccessful, however, and on April 25, 2000, plaintiffs filed their third amended complaint (Doc. 331), reflecting a major change in ADA law as a result of the U.S. Supreme Court's watershed decision in *Olmstead.* Defendants moved to dismiss on May 12, 2000. Plaintiffs moved for partial summary judgment on their ADA claim under *Olmstead* on July 31, 2000 (Doc. 364). Since that time, the parties have litigated discovery disputes, and plaintiffs have filed several memoranda alerting the Court to recent decisions pertinent to the issues this case presents.

## B. Parties

The third amended class action complaint names plaintiff representatives Nancy Martin, Kathy R., Claude Martin, and Warren B. All of the plaintiffs are eligible for and receive federal Medicaid benefits. All of the plaintiffs have been housed in institutions which received funds from Medicaid. All of the plaintiffs are eligible to be moved to noninstitutional, integrated community-based housing, and several of the plaintiffs have taken specific steps to obtain such housing.

Plaintiffs name three defendants: Governor Robert Taft; Kenneth Ritchey, Director of the Ohio Department of Mental Retardation and Developmental Disabilities ("ODMR/DD"); and Jacqueline Romer–Sensky, Director of the Ohio Department of Human Services ("ODHS"). Plaintiffs sue defendants in defendants' official capacities only.

### 1. Plaintiff representatives

#### a. Nancy Martin

Nancy Martin is a fifty-two year old woman who has disabilities, including cerebral palsy, mental retardation, and depression. She has an intelligence within the moderate range of mental retardation. Ms. Martin is confined to an electric wheelchair due to her cerebral palsy and spastic quadriplegia. She has a limited ability to speak, and communicates through use of a word book, an augmentative communication device, gestures, verbalizations, pointing and nodding. Ms. Martin has experienced depression for many years. She treats her depression with antidepressant medication.

Ms. Martin has lived in institutional settings for more than thirty years. She was originally involuntarily committed to the Mount Vernon Developmental Center because her father died and her mother was unable to care for her. She remained in the Mount Vernon facility for about twenty-five years. During that period, the Mount Vernon facility housed more than 300 individuals with mental retardation and developmental disabilities.

The Mount Vernon facility is operated by defendant Kenneth Ritchey. Individu-

als who reside at the Mount Vernon facility are segregated from non-handicapped persons.

Throughout her years at the Mount Vernon facility, Ms. Martin wanted to live in the community, and she expressed this desire to the staff at the facility. Professional staff at the Mount Vernon facility acknowledged for many years that Ms. Martin's placement at the facility was inappropriate, and recommended that Ms. Martin be moved to a community setting.

On October 9, 1991, Ms. Martin was removed from the Mount Vernon facility and placed at the Echoing Lake facility in Lorain County. Echoing Lake is known as an Intermediate Care Facility for the Mentally Retarded ("ICF/MR"). Echoing Lake is an eight-bed institution licensed by defendant Ritchey.

In May 1993, Ms. Martin had surgery to place a PEG Tube in her stomach to address increased problems she had swallowing. After the operation, Echoing Lake insisted that Ms. Martin be moved to a different facility, stating she required 24-hour availability of nursing staff in the event she had problems with her PEG Tube. Plaintiffs aver that people with this condition are regularly served in integrated community settings, and hence placement in the more restrictive setting was unnecessary.

Ms. Martin, however, was moved to Echoing Ridge Residential Center, a fifty-bed ICF/MR in Stark County. Echoing Ridge is segregated from non-handicapped persons. As a result of the move, Ms. Martin was forced to quit her employment and leave her friends, and live farther from her family.

Eventually Ms. Martin was able to eat without the PEG Tube, and she was then moved to another Echoing Lake ICF/MR facility located in Vermillion, Ohio. At some point, it again became necessary for Ms. Martin to be fed through her PEG Tube, and once again the facility made plans to move her to the larger, more restrictive Echoing Ridge facility. In this instance, however, legal counsel intervened and prevented the move.

Ms. Martin is eligible for and receives Medicaid benefits. Medicaid has paid for her care at the Echoing Lake and Echoing Ridge facilities. Defendant Romer–Sensky has certified and funded each of the Echoing facilities as ICFs/MR under the Medicaid program.

Each year professionals who treat Ms. Martin evaluate her to determine the level of care she requires. Each year the treating professionals have determined that Ms. Martin requires the level of care provided by an ICF/MR in order to re-certify her to receive Medicaid funding at the institution. Plaintiffs aver that the treating professionals generally fail to consider whether Ms. Martin meets the essential eligibility requirements for habilitation in a community-based program.

In pursuit of her goal to live in the community, Ms. Martin has told her case workers that she wants to move to a community setting, and has asked to be added to the supported living waiting list. Ms. Martin was placed on a waiting list for community-based services through the Individual Options waiver in April 1995. At the time plaintiffs filed their motion for partial summary judgment in July 2000, Ms. Martin was still on the waiting list and was living in an institution.

### b. Kathy R.

Kathy R. is a forty-nine year old woman who has disabilities of mental retardation and chronic schizophrenia. From time to time Kathy R. suffers from auditory hallucinations.

Kathy R. was involuntarily committed to the Gallipollis Developmental Center

("GDC") in 1967. She remained there until April 1974.

Kathy R. was re-institutionalized at GDC in October 1984 due to her mental illness and behavioral disabilities. She remained there until the commencement of this lawsuit.

When Kathy R. was living at GDC, it housed about 280 individuals with mental retardation or developmental disabilities. At the time the third amended complaint was filed in April 2000, about 255 individuals lived at GDC.

Throughout her institutionalization at GDC, Kathy R. was medicated with psychotropic drugs. These drugs caused her to suffer the side effect akathesia, which caused a subjective feeling that she needed to keep moving.

Kathy R. has occasional aggressive outbursts. She has received treatment for these outbursts in a behavioral management program.

Kathy R. did not want to live at GDC. She desired to live in a community group home. The interdisciplinary team at GDC determined that Kathy R. could be placed appropriately in small licensed group or foster home that offered the various services she required. As a result, in January 1994, Kathy R. was moved to Peterson Enterprises Ridge, a ten-bed ICF/MR in Hamilton County. The facility was eventually operated by We Care Homes.

In 1998, We Care Homes determined that all of the individuals who were institutionalized at its eight ICF/MR facilities, including Kathy R., could be served in noninstitutional, waiver-funded settings. To accomplish this, We Care Homes suggested to defendants' predecessors that it would voluntarily decertify its ICF/MR facilities, and over the course of a year work with the residents to determine where they wanted to live and with whom. We Care Homes proposed to fund the new services through a Medicaid Home and Community–Based Services ("HCBS") waiver using money currently paid by the State to the institutions. Defendants' predecessors rejected the proposal, which would have allowed the residents of eight ICF/MR institutions, including Kathy R., to choose community-based services at a cost not greater than the that of institutional services.

Each year professionals who treat Kathy R. evaluate her to determine the level of care she requires. As was the case with Ms. Martin, each year the treating professionals have determined that Kathy R. requires the level of care provided by an ICF/MR in order to re-certify her to receive Medicaid funding at the institution. Plaintiffs aver that the treating professionals generally fail to consider whether Kathy R. meets the essential eligibility requirements for habilitation in a community-based program.

Kathy R. was placed on a waiting list for community-based services in October 1994. At the time plaintiffs filed their motion for partial summary judgment in July 2000, she was still on the waiting list and was living in an ICF/MR.

#### c. Claude Martin

Claude Martin is a fifty-three year old man who has disabilities of cerebral palsy with spastic quadriplegia and mild mental retardation. He functions with severe deficits in adaptive behavior. Mr. Martin is confined to a wheelchair as a result of his cerebral palsy and spastic quadriplegia. He grooms and feeds himself independently. He bathes himself but needs help to get in and out of the bathtub. Mr. Martin uses an electric or manual wheelchair by himself, but needs assistance to transfer to and from the chair.

In December 1982, Mr. Martin was placed in the Echoing Valley Residential Home ("EVRH") in Dayton, Ohio. EVRH is a thirty-six bed ICF/MR. It is segre-

gated from non-disabled persons. Defendant Ritchey has licensed EVRH and defendant Romer–Sensky provides Medicaid funds to EVRH for its operation.

Mr. Martin has tried for many years, without success, to find a place to live that provides semi-independent living with some attendant care services. He wrote letters to defendants' predecessors, his Congressman, and the Dayton Daily News, which published his letter. Mr. Martin was on a waiting list for residential services in Montgomery County, Ohio for years.

Mr. Martin was denied placement in the LADD group homes in Cincinnati on the basis of his behavioral and physical handicaps. Mr. Martin filed a complaint against LADD and ODMR/DD with the federal Office of Civil Rights of the Health Care Financing Administration ("HCFA"), asserting that he had been discriminated against by reason of his disability. The HCFA proposed a voluntary remedial agreement to resolve the matter, but defendant Ritchey's predecessor refused to sign the agreement.

In August 1990, Mr. Martin was referred to Choices in Community Living, a residential services provider. He was denied residential services, however, because he is unable to transfer in and out of his wheelchair without assistance.

In January 1993, Mr. Martin applied for community-based services through the Individual Options HCBS waiver. His request was initially denied and he was placed on a waiting list. At the time, about 4000 people were on the list. Mr. Martin began receiving community-based services funded under the Individual Options waiver in 1996.

#### d. Warren B.

Warren B. is a thirty year old man with disabilities including closed head injury, mental retardation, seizure disorder, and behavioral impediments. He is develop-

mentally disabled. Warren B. was struck by a car when he was eight years old. His disabilities are the result of the accident.

In 1997, Warren B., through his guardian and mother, sought residential services in the TBI Outlier program, the only program in Ohio offering services for individuals with traumatic brain injury. TBI Outlier is an intensive behavioral program operated in a separate four-bed unit of a nursing facility. Treatment in the TBI Outlier program is typically limited to ninety days, after which clients are moved to more permanent housing.

Warren B. participated in the TBI Outlier program from August 1997 to February 1998. While there, Warren B. showed progress in several areas. He became more independent in bathing, dressing, and toileting. His communication advanced from single words to short phrases.

Warren B.'s negative behaviors include biting, spitting, pinching, and tripping others. His behavior appears to be affected by noise levels, transitions such as shift changes or transportation, and overstimulation. At times his maladaptive behavior indicates that he is experiencing pain. While at the Outlier program Warren B. experienced fewer and less intense behavioral episodes.

Upon discharge from the TBI Outlier program, Warren B. was placed in the Belmont Habilitation Center ("BHC") in Belmont County, Ohio. BHC is an eighty-five bed ICF/MR licensed by defendant Ritchey and funded by defendant Romer–Sensky under Medicaid. While he was at BHC, Warren B. regressed. His behavioral episodes increased, his ability to care for himself diminished, and he refused to eat or take medication.

In the fall of 1999, the Belmont County Board of Mental Retardation and Developmental Disabilities instituted proceedings to have Warren B. involuntarily institutionalized. Warren B. thereafter was com-

mitted to the Cambridge Developmental Center ("CDC"), a 100–bed ICF/MR operated by defendant Ritchey.

Plaintiffs aver that Warren B.'s behavior improved at TBI Outlier in part because he was placed with more capable clients because he models the behavior and skills of his peers. Most of the individuals residing at CDC are less capable than Warren B.

CDC controls Warren B.'s behavior by restraining him, against his will, in a helmet with a face guard strapped to a vest. The team at CDC has determined that alternative placements in foster care, group homes, or Individual Options waiver with well-trained staff may be the best long term goal for Warren B.

Warren B. applied for the Individual Options waiver on January 13, 1993. At the time plaintiffs filed their motion for partial summary judgment in July 2000, Warren B. was still living at CDC.

### 2. Defendants

#### a. Governor Robert Taft

Defendant Robert Taft is the Governor of the State of Ohio. Governor Taft appointed defendant Kenneth Ritchey to be Director of ODMR/DD and defendant Jaqueline Romer–Sensky to be director of the ODHS. Under Article III Section 6 of the Ohio Constitution, Governor Taft is charged with ensuring that the laws are faithfully executed by his officers.

#### b. Kenneth Ritchey

Defendant Kenneth Ritchey is the director of ODMR/DD. Under Ohio law, Ritchey controls all duties performed by ODMR/DD.

In his official capacity, Mr. Ritchey operates twelve developmental centers for individuals with mental retardation and developmental disabilities. These twelve institutions receive federal funds in the form of Medicaid.

Mr. Ritchey is responsible for preadmission screening ("PAS"), which determines whether individuals seeking admission to a nursing facility require the level of services provided by such a facility. He is also responsible for Resident Review ("RR"), which determines whether current nursing facility residents require the services of a nursing facility or an ICF/MR, and whether residents require any specialized services.

Also among Ritchey's official duties is promulgation of rules governing the development of residential services for mentally retarded and developmentally disabled individuals. These rules include development plans for each county MR/DD board and eligibility criteria for selecting providers of residential services.

#### c. Jaqueline Romer–Sensky

Defendant Jacqueline Romer–Sensky is the Director of the ODHS. Under Ohio law, Romer–Sensky controls ODHS and all of its duties.

ODHS is the designated single state agency responsible for administration of the federal Medicaid program in Ohio. The Medicaid program is a joint federal/state program providing federal financial assistance to states, like Ohio, that have elected to participate. Medicaid reimburses the participating states for certain costs of medical treatment for needy persons.

Romer–Sensky is responsible for ensuring that Ohio's Medicaid program complies with all relevant federal requirements, including the provisions upon which plaintiffs rely in their claims.

### C. Facts underlying plaintiffs' claims[4]

Plaintiffs allege, in essence, that defendants have failed to develop community-based services for the class, and have in

---

**4.** It bears repeating that these factual assertions are based on circumstances that alleged-

fact hindered the expansion of such services, instead favoring institutional care. Plaintiffs aver that resources exist to fund community-based services in the form of Medicaid waivers, and that the cost of community-based care is, on the average, less then the cost of providing services in an institution. Plaintiffs maintain that thousands of mentally retarded and developmentally disabled individuals remain unnecessarily institutionalized.

### 1. Institutions

The third amended complaint explains the types of institutions in which class members currently receive services. Plaintiffs assert generally that these institutions are segregated from the larger community of non-disabled persons.

First, as alluded to above, ODMR/DD Director Ritchey directly operates twelve institutions referred to as developmental centers. About 2000 mentally retarded and developmentally disabled individuals in Ohio receive care in State developmental centers. Ohio's developmental centers are designated Intermediate Care Facilities for the Mentally Retarded ("ICFs/MR")[5] for purposes of receiving federal benefits under Medicaid.

Second, class members reside in privately operated ICFs/MR. These institutions are licensed by ODMR/DD and receive Medicaid funds through ODHS. Private ICFs/MR range in size from four bed facilities to facilities serving more than 100 individuals. A majority of individuals served in ICFs/MR live in facilities with more than 16 beds.

Plaintiffs contend that Ohio relies heavily on providing care in ICFs/MR. About 5,700 individuals with mental retardation and developmental disabilities reside in privately owned ICFs/MR. Ohio ranks fifth in the nation in the number of individuals served in ICFs/MR, behind Texas, New York, California, and Illinois, each of which has a larger population than Ohio. Ohio ranks third in the percentage of federal ICFs/MR funds used, behind only New York and Texas.

The annual cost of ICFs/MR in Ohio totals about $535 million. The federal government pays about 59 percent of this cost, and the State pays the remainder.

Third, services are provided to about 2,400 mentally retarded and developmentally disabled individuals in nursing facilities.[6] These nursing facilities are not

---

ly existed in 2000. Significant changes may have occurred since that time. *See* note 3, *supra*.

5. ICF/MR is defined under Medicaid law in 42 U.S.C. § 1396d(d), which states in pertinent part:

The term "intermediate care facility for the mentally retarded" means an institution (or distinct part thereof) for the mentally retarded or persons with related conditions if—.
(1) the primary purpose of such institution (or distinct part thereof) is to provide health or rehabilitative services for mentally retarded individuals and the institution meets such standards as may be prescribed by the Secretary;
(2) the mentally retarded individual with respect to whom a request for payment is made under a plan approved under this subchapter

is receiving active treatment under such a program.

6. "Nursing facility" is another Medicaid term of art, defined generally as follows:
In this subchapter, the term "nursing facility" means an institution (or a distinct part of an institution) which—
(1) is primarily engaged in providing to residents—
(A) skilled nursing care and related services for residents who require medical or nursing care,
(B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or
(C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities, and is not

certified to care for people with mental retardation or developmental disabilities. Ohio has more individuals with mental retardation and developmental disabilities in nursing facilities than any other state in the nation.

Plaintiffs aver that Congress passed laws in 1990 to limit placement of individuals with mental disabilities in nursing facilities. They maintain that in response most states dramatically reduced the number of mentally retarded and developmentally disabled individuals in nursing facilities, moving many into smaller community based settings. In Ohio, however, the number of such individuals in nursing facilities has not changed significantly.

### 2. Medicaid Waivers

Plaintiffs maintain that thousands of individuals in Ohio qualify for community-based care but have been placed in segregated institutions. Plaintiffs contend that this is due in part to defendants refusal or failure use existing Medicaid Home and Community–Based Services ("HCBS") waiver slots or to apply for additional waiver slots. The HCBS waiver program is an important aspect of plaintiffs' case.[7]

Congress enacted the HCBS waiver program in 1981. Flexibility is the touchstone of the HCBS waiver program, and it was intended to provide the states latitude to create new approaches for providing health care services financed by Medicaid. *See* 42 C.F.R. § 430.25(b). To this end, § 1915(c) of the Social Security Act provides that states may request waivers of certain federal requirements to obtain Medicaid funding for programs to provide community-based services. 42 U.S.C. § 1396n(c)(1). Such programs may provide "habilitation services," which are "designed to assist individuals in acquiring, retaining and improving the self-help, socialization, and adaptive skills necessary to reside successfully in home and community based settings." 42 U.S.C. § 1396n(c)(4)(B) and (c)(5). Under this system, if the State program meets certain criteria, three Medicaid requirements are waived: (1) the statewide requirement of 42 U.S.C. § 1396a(a)(1); (2) the single eligibility standard of 42 U.S.C. § 1396a(a)(10)(C)(i)(II); and (3) the comparability of services requirement of 42 U.S.C. § 1396a(a)(10)(B). *See* 42 U.S.C. § 1396n(c)(3).

For a program to qualify for an HCBS waiver, the state must provide assurances that there are adequate safeguards in place to protect the health and welfare of individuals who participate in the waiver program. 42 U.S.C. § 1396n(c)(2)(A). The state must also provide the following assurance:

> under such waiver the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted.

42 U.S.C. § 1396r(a).

---

primarily for the care and treatment of mental diseases;

(2) has in effect a transfer agreement (meeting the requirements of section 1395x(*l*) of this title) with one or more hospitals having agreements in effect under section 1395cc of this title; and

(3) meets the requirements for a nursing facility described in subsections (b), (c), and (d) of this section.

**7.** For a thorough discussion of the HCBS waiver program, its history and impact, see Margaret K. Feltz, Note, *Playing the Lottery: HCBS Lawsuits and Other Medicaid Litigation of Behalf of the Developmentally Disabled,* 12 Health Matrix 181 (2002).

42 U.S.C. § 1396n(c)(2)(D). Further, the state must assure that individuals in hospitals, nursing facilities, and ICFs/MR are informed of feasible alternatives available under the waiver. 42 U.S.C. § 1396n(c)(2)(C). Under the HCBS waiver program, states request a specific number of "slots" for individuals to be approved by the federal Health Care Financing Administration ("HCFA").

Ohio participates in several waiver programs designed to serve individuals who are otherwise eligible to receive services in an ICF/MR. The two programs most significant to this case are the Individual Options ("IO") waiver and the Residential Facilities Waiver ("RFW").

The IO waiver uses certified providers of supported living services for home and personal care services. The HCFA initially approved 2,512 IO waiver slots for Ohio.

Plaintiffs assert that defendants used these slots to fund preexisting community-based programs that had been financed by the State or counties. For example, about 250 individuals who had been served under a model waiver program were simply transferred to IO waiver slots. In a similar vein, plaintiffs aver defendants encouraged providers in another early, state-funded group home program to enroll their residents in the IO waiver program. Plaintiffs maintain that about 700 individuals from the group home program became recipients of the IO waiver. These individuals were not given a choice of providers, and the services they received did not change under the IO waiver. In essence, plaintiffs allege that defendants and their predecessors used this as a device to shift the cost of earlier state-funded community-based programs to Medicaid, and defendants did little to use the IO waiver to create community-based services for more individuals.

Plaintiffs also aver that the State has failed to provide the necessary matching funds for IO waiver slots. As a result, many approved slots have not been made available to qualified individuals currently in institutions.

Plaintiffs assert that as of May 1996, 11,000 individuals were on a waiting list for IO waiver services. Plaintiffs state that the average annual cost of IO waiver services is about $39,000 per person, compared to an average annual cost of $65,933 per person to provide services in an ICF/MR.

The State also administers the RFW program. Service providers of service under the state-funded Purchase of Service ("POS") program had gone without any per diem rate increases for many years before the RFW program. Plaintiffs say the State used the RFW to obtain federal Medicaid dollars to allow a rate increase for POS providers that were already providing community-based services in group homes.

The RFW program has 3,434 approved slots. Nonetheless, only about 2800 individuals receive services under the RFW. The vast majority of these 2800 individuals simply continue to receive the same services from the same provider as they had before the RFW program. Therefore, in Ohio the RFW program has not resulted in any significant number of additional individuals receiving community-based services.

Plaintiffs also maintain that the RFW program is not administered statewide. Seventy counties participate in the RFW, and many of the participating counties' MR/DD boards will not refer an individual from outside their county for an RFW opening in their county. Service providers participating in the RFW are often allowed to select the individuals they want to serve regardless to that individual's place on a waiting list. Many service providers have refused to accept individuals with mobility

impairments or other significant physical disabilities.

Plaintiffs aver that the average annual cost of serving an individual under the RFW is $29,250, compared to $65,933 for ICF/MR services, and $39,000 for services under the IO waiver.

In sum, plaintiffs assert that defendants have failed properly to use approved waiver slots, and have instead continued to rely heavily on developmental centers, ICFs/MR, and nursing facilities. This, plaintiffs say, has resulted in the unnecessary institutionalization of thousands of mentally retarded and developmentally disabled individuals in Ohio.

## IV. Defendants' motion to dismiss

A motion to dismiss for failure to state a claim should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All well-pleaded allegations must be taken as true and be construed most favorably toward the nonmoving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir.1983). The merits of the claims set forth in the complaint are not at issue on a motion to dismiss for failure to state a claim. Consequently, a complaint will be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) only if there is no law to support the claims made, or if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief. *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir.1978). Rule 12(b)(6) must be read in conjunction with Fed.R.Civ.P. 8(a) which provides that a pleading for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 296 (2d ed.1990). The moving party is entitled to relief only when the complaint fails to meet this liberal standard. *Id.*

On the other hand, more than bare assertions of legal conclusions are required to satisfy the notice pleading standard. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988). "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* at 437. (Quotes omitted).

> [W]e are not holding the pleader to an impossibly high standard; we recognize the policies behind rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

*Id.*

■ Defendants advance four categories of arguments in support of their motion to dismiss. First, they argue that Congress exceeded its authority to abrogate Eleventh Amendment immunity in enacting the ADA and RA.[8] Second, they maintain that the ADA and RA do not require the creation of new Medicaid services. Third, defendants contend that plaintiffs' § 1983 Medicaid law claims fail because the feder-

---

**8.** Defendants do not differentiate between the ADA and the RA. The two Acts are similar in many respects, and analysis of claims under these Acts "runs roughly parallel." *Mahon v.* *Crowell*, 295 F.3d 585, 589 (6th Cir.2002). Limitations the United States Supreme Court has placed upon the ADA apply equally to the RA. *Id.* at 590.

al statutes and regulations to which plaintiffs refer do not create enforceable rights. Fourth, defendants assert that plaintiffs fail to state a due process claim under *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

## A. Eleventh Amendment Immunity

Defendants once again [9] argue that the Eleventh Amendment bars plaintiffs' ADA and RA claims. Plaintiffs maintain that the Eleventh Amendment does not apply to their claims because they seek only prospective injunctive and declaratory relief.

■ The United States Court of Appeals for the Sixth Circuit has held that Ohio waived its sovereign immunity against Rehabilitation Act claims when it agreed to accept federal funds under the Act. *Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir.2002); *Nihiser v. Ohio EPA*, 269 F.3d 626, 628 (6th Cir.2001). The Court therefore rejects defendants' Eleventh Amendment argument as it applies to plaintiffs' RA claims. Analysis of Eleventh Amendment immunity as to plaintiffs' ADA claims, however, is more complex.

■ The Eleventh Amendment to the U.S. Constitution states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. In recognition of "the broader concept of immunity, implicit in the Constitution," the U.S. Supreme Court has extended the Eleventh Amendment's meaning to preclude suits in federal court against a state by its own citizens. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *see also Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Eleventh Amendment not only protects states from suit in federal court but may also shield state officials with immunity. *Lee v. W. Reserve Psychiatric Habilitation Ctr.*, 747 F.2d 1062, 1065 (6th Cir.1984).

■ Nonetheless, a suit that claims that a state official's actions violate the U.S. Constitution or federal law is not deemed a suit against the state, and is therefore not barred by sovereign immunity, so long as the state official is the named defendant and the relief sought is only equitable and prospective. *Ex parte Young*, 209 U.S. 123, 160–62, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Westside Mothers v. Haveman*, 289 F.3d 852, 860 (6th Cir. 2002). Hence, " '[s]ince *Ex parte Young*, ... it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law.' " *Westside Mothers*, 289 F.3d at 860–61 (quoting *Hafer v. Melo*, 502 U.S. 21, 30, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)). The *Ex parte Young* doctrine "gives life to the Supremacy Clause." *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Id.*

The U.S. Supreme Court has suggested in *dicta* that ADA claims which seek pro-

**9.** The Court rejected defendants' Eleventh Amendment immunity argument in its earlier decision in this case. *See Martin*, 840 F.Supp. at 1187. Nonetheless, the law on Eleventh Amendment immunity has developed since that decision, and although these developments ultimately do not favor defendants, reexamination of the issue is warranted.

spective injunctive relief are not barred by the Eleventh Amendment. *Bd. of Tr. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 374 n. 9, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Citing *Garrett,* the United States Court of Appeals for the Sixth Circuit has held expressly that the Eleventh Amendment does not bar an ADA Title II claim for prospective relief against state officials in their official capacities. *Carten,* 282 F.3d at 396–97. Moreover, in cases factually similar to the case at bar, at least two district courts have held that the Eleventh Amendment does not prevent injunctive relief against state officials for violation of the ADA or the RA, or provisions of Medicaid law. *See Bryson v. Shumway,* 177 F.Supp.2d 78, 87 (D.N.H.2001)(in suit by persons with acquired brain disorders seeking provision of community-based care with "reasonable promptness" under Medicaid Act, the court held that the Eleventh Amendment does not bar claim for prospective relief under *Ex parte Young* ); *Frederick L. v. Dept. of Pub. Welfare,* 157 F.Supp.2d 509, 531–32 (E.D.Pa.2001)(Title II ADA and RA claims by disabled patients in state mental hospital seeking community services not barred by Eleventh Amendment under *Ex parte Young* ); *but see Lewis v. N.M. Dept. of Health,* 94 F.Supp.2d 1217, 1230 (D.N.M.2000)(in suit by disabled individuals asserting impermissible delay of Medicaid waiver services, the court held that ADA claims against state officials were not properly brought pursuant to *Ex Parte Young* because ADA Title II provided for claims for discrimination by "any such *entity* " and named state officials could not be entities, but claims under § 1983 were not barred) [10], *aff'd,* 261 F.3d 970 (10th Cir.2001).

The U.S. Supreme Court has clarified the dividing line between permissible relief and relief proscribed by the Eleventh Amendment, distinguishing between prospective and retroactive relief in *Edelman v. Jordan,* 415 U.S. 651, 664–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Eleventh Amendment bars the award of retroactive relief for violations of federal law which would require the payment of funds from a state treasury. *Id.* at 663, 94 S.Ct. 1347. "The federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102–03, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The immunity is triggered when relief amounts to the payment of state funds as a form of compensation for past breaches of legal duties by state officials. *Edelman,* 415 U.S. at 668, 94 S.Ct. 1347.

Nonetheless, the Eleventh Amendment does not bar prospective relief that has an ancillary or incidental effect on the state treasury. *Id.* In *Edelman,* the U.S. Supreme Court stated:

> State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young, supra.*

415 U.S. at 667–68, 94 S.Ct. 1347; *see also Nelson v. Miller,* 170 F.3d 641, 646–47 (6th

**10.** The court in *Lewis* did not distinguish between claims brought against individuals in their individual capacities as distinct from their official capacities and did not consider the dicta in *Garrett.* In addition, on this point *Lewis* is at odds with Sixth Circuit precedent, which considered the ADA's definition of "public entities" but nevertheless held that state officials could be sued in their official capacities for prospective relief for violation of ADA Title II under *Ex parte Young. Carten,* 282 F.3d at 396–97.

Cir.1999)(applying *Edelman*, holding that injunction requiring state to purchase voting devices to ensure privacy for blind voters would not violate the Eleventh Amendment, even though state would be required to buy such devices). The Supreme Court has further stated that the distinction between retroactive and prospective relief does "not immunize the States from their obligation to obey costly federal-court orders. The cost of compliance is 'ancillary' to the prospective order enforcing federal law." *Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

■ To determine whether a claim falls within the *Ex parte Young* doctrine, the Court need conduct only " 'a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law

and seeks relief properly characterized as prospective.' " *Verizon Md., Inc. v. Pub. Serv. Comm'n Of Md.*, 535 U.S. 635, 122 S.Ct. 1753, 1760, 152 L.Ed.2d 871 (2002)(quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)(O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)); *Westside Mothers*, 289 F.3d at 861. The Court therefore will examine whether the relief plaintiffs seek is prospective.

■ The plaintiffs express the essence of the relief they seek as follows: "to enjoin the Defendants to create over a reasonably short, fixed time, not to exceed five years, the community housing and support services for each Plaintiff and class member as determined by the needs of the class member." (Third Am. Compl. (Doc. 331) at 71).[11]

11. The prayer for relief, in its entirety, requests that the Court:

1. Accept jurisdiction over this matter.
2. Certify the class to include all persons in Ohio with mental retardation or developmental disabilities who are or will be in need of community housing and services which are normalized, home-like and integrated.
3. Declare Defendants Taft, Ritchey, and Romer–Sensky in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution, the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12101 *et seq.*), Section 504 of the Rehabilitation Act of 1973, as amended, Title XIX of the Social Security Act (42 U.S.C. Sec. 1396, *et. seq.*) and the Civil Rights Act (42 U.S.C. Sec.1983).
4. Enjoin the defendants to identify within six months all members of the class and subclass.
5. Enjoin the defendants to create over a reasonably short, fixed time, not to exceed five years, the community housing and support services for each plaintiff and class member as determined by the needs of the class member.
6. Enjoin the defendants to ensure ongoing assistance for class members in their

transition to the community and to enable community residential facilities to receive immediate or ongoing training and assistance with programming to allow class members to remain in community homes.
7. Enjoin the defendants to comply with the notice and grievance procedure requirements of 28 C.F.R. Sec. 35.106 and 35.107.
8. Enjoin the defendants to ensure that agencies to whom the defendants provide significant assistance and who provide residential or other support services to the class, meet the anti-discrimination requirements of Section 504 and the ADA.
9. Enjoin the defendants to ensure Medicaid services for class members are equal in amount, duration, and scope regardless of the county in which they are provided.
10. Enjoin Defendant Romer–Sensky to ensure that when class members are determined to be likely to require the level of care provided in an ICF/MR or a nursing facility that the class member or his or her legal representative is informed of any feasible alternatives available under the Individual or Residential Facilities waiver or Home Care waiver and given the choice of either institutional or home and community based services.

Plaintiffs seek only prospective relief. In addition, the third amended complaint implicitly alleges ongoing violations of federal law. Moreover, plaintiffs sue defendants in defendants' official capacities only. (Third Am. Compl. (Doc. 331) ¶¶ 259, 267, and 292). Hence, the requirements of the application of *Ex parte Young* are satisfied in this case.

 Although defendants generally acknowledge the *Ex parte Young* doctrine, they nonetheless contend that plaintiffs' ADA claims are barred because Congress exceeded its authority when it purported to abrogate Eleventh Amendment immunity in enacting the ADA. Defendants are partially correct in arguing that Congress exceeded its authority with respect to the ADA. *See Popovich v. Cuyahoga County Ct. of C.P.,* 276 F.3d 808, 812 (6th Cir. 2002)(*en banc*)(holding that the Equal Protection Clause does not provide Congress with a basis to abrogate Eleventh Amendment immunity with respect to ADA Title II claims). The abrogation issue is, however, a red herring. As the Court in *Garrett* observed, even where Congress lacks authority to abrogate a state's sovereign immunity to ADA damages claims, ADA standards remain enforceable in actions for injunctive relief under *Ex parte Young.* 531 U.S. at 374 n. 9, 121 S.Ct. 955; *Carten,* 282 F.3d at 396–97.

Defendants also argue that plaintiffs' ADA claims would require them to reorder the State's budgetary priorities, and therefore fall within the special sovereignty interest exception to the *Ex parte Young* doctrine, as articulated in *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). In *Coeur d'Alene,* the Court recognized that even when the requirements for application of *Ex parte Young* have been met, in unusual cases a claim may nonetheless be barred by the Eleventh Amendment if it implicates a special state sovereignty interest. 521 U.S. at 281, 117 S.Ct. 2028.

The principal plaintiff in *Coeur d'Alene* was a federally-recognized Native American Tribe. The Tribe filed suit in federal court against the State of Idaho and various state officials and agencies, seeking a declaratory judgment that the Tribe owned certain submerged land, and injunctive relief prohibiting the defendants from regulating, permitting the use of, or taking any action in violation of the Tribe's asserted exclusive rights to the land.

The defendants in *Coeur d'Alene* moved to dismiss on the bases of Eleventh Amendment Immunity and failure to state a claim. The district court granted the motion, holding that the Eleventh Amendment barred the Tribe's claims against the state and its agencies, and that the Eleventh Amendment further precluded the

11. Enjoin Defendants Taft, Ritchey and Romer–Sensky to ensure that PASRR evaluations are based on subclass members' needs and not on the lack of available residential services.

12. Enjoin Defendants Taft, Ritchey and Romer–Sensky to ensure compliance with all PASRR requirements.

13. Enjoin Defendants Taft, Ritchey and Romer–Sensky to inform subclass members in ICFs/MR and nursing facilities of their noninstitutional alternatives for residential services in a manner that can be understood by the subclass member.

14. Enjoin Defendants Taft, Ritchey and Romer–Sensky to ensure the choice of alternative placement is the choice of the subclass member and not the choice of a non-legal representative.

15. Award the plaintiffs their costs and attorneys' fees.

16. Award the plaintiffs and members of the class such other relief as is necessary to guarantee their rights to effective services in integrated community settings.

(Third Am. Compl. (Doc. 331) at 70–72).

Tribe's quiet title and declaratory judgment claims against the state officials because they were the functional equivalent of a damages award against the state. The Ninth Circuit Court of Appeals affirmed in part and reversed in part, stating that the Eleventh Amendment did not bar the Tribe's claims for declaratory and injunctive relief against the state officials for violation of federal law.

The U.S. Supreme Court reversed. *Coeur d'Alene*, 521 U.S. at 288, 117 S.Ct. 2028. The Court observed: "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction. However, this case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests." *Id.* at 281, 117 S.Ct. 2028. The Court then examined the nature of the interest of the state, as a sovereign, in the disputed land, tracing the history of sovereigns' land interests from the Institutes of Justinian, through English common law and American law as it developed during the nineteenth century. *Id.* at 283–87, 117 S.Ct. 2028. The Court determined that the state's interest in the disputed submerged lands was " 'an essential attribute of sovereignty' " *id.* at 283, 117 S.Ct. 2028 (quoting *Utah Div. of State Lands v. United States,* 482 U.S. 193, 195, 107 S.Ct. 2318, 96 L.Ed.2d 162 (1987)), concluding "under these particular and unique circumstances, we find the *Young* exception inapplicable." *Id.* at 287, 117 S.Ct. 2028. Key to the Court's analysis was that, as the equivalent

to a quiet title action, the relief the Tribe sought would have extinguished forever any and all rights the state may have had to the submerged land, and hence, "if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." *Id.*[12]

■ *Coeur d'Alene* requires a two-step inquiry: First, the court must determine whether the relief requested implicates a special or core state sovereignty interest. *MacDonald v. Vill. of Northport, Mich.,* 164 F.3d 964, 972 (6th Cir.1999); *Ellis v. Univ. of Kan. Med. Ctr.,* 163 F.3d 1186, 1198 (10th Cir.1998). If the first requirement has been satisfied, then the court must proceed to examine whether the relief sought is so intrusive upon the state's sovereignty that it constitutes the functional equivalent of relief the Eleventh Amendment bars. *MacDonald,* 164 F.3d at 973; *Ellis,* 163 F.3d at 1198.

Recognizing the unusual nature of the circumstances facing the Court in *Coeur d'Alene,* federal circuit courts have been circumspect in applying its holding, interpreting *Coeur d'Alene* as a narrow exception to the *Ex parte Young* doctrine. *See MCI Telecomm. Corp. v. Bell Atlantic–Pennsylvania,* 271 F.3d 491, 514–15 (3rd Cir.2001)(state lacked special sovereignty interest in regulating local telephone competition where authority to do so derives solely from grant of power by Congress); *Antrican v. Odom,* 290 F.3d 178, 189–90 (4th Cir.2002)(state's election to participate

---

**12.** Justice Kennedy delivered the judgment of the Court in *Coeur d'Alene.* In addition to the propositions set forth above, Justice Kennedy advocated the application of a case-by-case test that would examine and balance federal and state interests. *Coeur d'Alene,* 521 U.S. at 279–80, 117 S.Ct. 2028. However only Chief Justice Rehnquist concurred in this aspect of Kennedy's opinion. The seven remaining justices rejected the balancing test. *Id.* at 288–97, 117 S.Ct. 2028 (concurring opinion by O'Connor, J., joined by Scalia and Thomas, J.J.); *id.* at 304 n. 6, 117 S.Ct. 2028 (dissenting opinion by Souter, J., joined by Stevens, Ginsburg and Breyer, J.J.). As such, Justice Kennedy's proposed balancing test has not been applied by lower courts. *See Hamilton v. Myers,* 281 F.3d 520, 528–29 (6th Cir.2002).

in Medicaid precluded finding of special sovereignty interest in administering program); *TFWS, Inc. v. Schaefer,* 242 F.3d 198, 206 (4th Cir.2001)(despite Twenty–First Amendment, state did not have special sovereignty interest in regulation of liquor sales); *Lipscomb v. Columbus Mun. Separate Sch. Dist.,* 269 F.3d 494, 501–02 (5th Cir.2001)(lessee's Contract Clause action to declare as enforceable the terms of leases state entered in the early nineteenth century did not implicate special state sovereignty interest); *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.,* 222 F.3d 323, 347–48 (7th Cir.2000)(state did not have special sovereignty interest in regulation of telecommunications providers); *Goldberg v. Ellett,* 254 F.3d 1135, 1143 (9th Cir.2001)(no special state sovereignty interest implicated by discharge of state taxes in federal bankruptcy proceeding as relief sought merely related to, but did not intrude upon, core state sovereign interest in taxation); *Agua Caliente Band of Cahuilla Indians v. Hardin,* 223 F.3d 1041, 1048 (9th Cir.2000)(same); *Robinson v. Kansas,* 295 F.3d 1183, 1191–92 (10th Cir. 2002)(no special sovereignty interest at stake in case seeking to enjoin state school finance law); *Joseph A. ex rel. Wolfe v. Ingram,* 275 F.3d 1253, 1261 (10th Cir. 2002)(state's interest in administering welfare program partially funded by federal government not a core sovereign interest); *Lewis v. N.M. Dept. of Health,* 261 F.3d 970, 978 (10th Cir.2001)(state's interest in taxation of Indian tribe important but not core in light of federal interest in Indian immunity); *Roe v. Ogden,* 253 F.3d 1225, 1233–34 (10th Cir.2001)(action under ADA by law students to enjoin use of questions in bar application relating to past treatment for mental disorders and substance addiction did not implicate special state sovereignty interest); *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1286 (10th Cir. 1999)(state's interest in administering welfare program partially funded by federal government not a core sovereign interest); *Ellis v. Univ. of Kan. Med. Ctr.,* 163 F.3d 1186, 1198 (10th Cir.1998)(plaintiff's claims for prospective relief in employment discrimination suit did not implicate special sovereign interest); *Branson Sch. Dist. RE–82 v. Romer,* 161 F.3d 619, 632–33 (10th Cir.1998)(relief sought by school districts and public school students to enjoin changes to state management of land trust for public schools was not equivalent to quiet title action); *Elephant Butte Irrigation Dist. of N.M. v. Dept. of Interior,* 160 F.3d 602, 612–13 (10th Cir.1998)(suit by irrigation district to enjoin state to pay district a share of net profits under recreational land lease with United States did not entail special state sovereignty interest, and relief sought was not equivalent to quiet title action); *Summit Med. Assoc. v. Pryor,* 180 F.3d 1326, 1340–41 (11th Cir. 1999)(state lacked special sovereignty interest to impose criminal penalties for partial-birth and post-viability abortions); *cf. Duke Energy Trading and Mktg., L.L.C. v. Davis,* 267 F.3d 1042, 1053–54 (9th Cir.2001)(governor's emergency power to take private property a core state sovereignty interest, although lawsuit merely implicating that power did not trigger *Coeur d'Alene* ); *ANR Pipeline Co. v. Lafaver,* 150 F.3d 1178, 1193–94 (10th Cir. 1998)(state power to tax property is a core sovereignty interest, and lawsuit seeking recertification of state property tax assessment was fully as intrusive as retroactive money judgment).

The United States Court of Appeals for the Sixth Circuit has likewise declined to extend *Coeur d'Alene. See Arnett v. Myers,* 281 F.3d 552, 567–68 (6th Cir.2002)(*Coeur d'Alene* does not extend to every case involving state property interest, and state's interest in regulation of riparian rights does not implicate *Coeur d'Alene* where the suit does not seek to quiet title); *Hamilton v. Myers,* 281 F.3d

520, 526 (6th Cir.2002)(same). The Sixth Circuit specifically has determined that *Coeur d'Alene* does not apply to claims for prospective relief brought under federal anti-discrimination laws. *Carten v. Kent State Univ.*, 282 F.3d 391, 397 (6th Cir.2002)(holding that *Coeur d'Alene* does not bar claim for prospective relief under ADA Title II, citing *Garrett*, 121 S.Ct at 968 n. 9). In two other decisions, however, the Sixth Circuit has recognized the presence of a special state sovereignty interest. *Barton v. Summers*, 293 F.3d 944, 951 (6th Cir.2002)(state interest in allocating proceeds of tobacco settlement implicates special sovereignty issue where Congress expressly enacted that states may allocate the proceeds as they please); *MacDonald v. Village of Northport, Mich.*, 164 F.3d 964, 972 (6th Cir.1999)(suit seeking declaration that right of way belonged to plaintiffs similar to quiet title action and was therefore barred by Eleventh Amendment).

■■■ Along with the decision of the Tenth Circuit in *ANR Pipeline*, and of the Ninth Circuit in *Duke Energy*, *Barton* and *MacDonald* represent the relatively few cases in which a special state sovereignty issue has been found to exist. Viewed together, the circuit court decisions applying *Coeur d'Alene* illustrate that even significant or important state concerns do not necessarily rise to the level of special state interests. *See Agua Caliente*, 223 F.3d at 1048. To qualify as a special state interest, the attribute of state sovereignty must be "core," *Goldberg*, 254 F.3d at 1143; *ANR Pipeline*, 150 F.3d at 1193, "essential" *Coeur d'Alene*, 521 U.S. at 283, 117 S.Ct. 2028; *MCI Telecomm*, 271 F.3d at

508, or "fundamental" 271 F.3d at 508. Thus far, the only four special interests have been identified: (1) a state's rights in real property—at least where the lawsuit threatens to eliminate the state's interest entirely—*Coeur d'Alene*, 521 U.S. at 283, 117 S.Ct. 2028; *MacDonald*, 164 F.3d at 972; (2) the power to tax, *ANR Pipeline*, 150 F.3d at 1193;[13] (3) the emergency power of a state governor to take private property for the benefit and safety of the public, *Duke Energy*, 267 F.3d at 1053–54; and (4) the authority of the state to allocate tobacco settlement funds, which authority Congress expressly granted to the state, *Barton*, 293 F.3d at 955.

■■■ Even the presence of a special state sovereignty issue is not, by itself, sufficient to immunize the state. Rather the second requirement of *Coeur d'Alene* also must be fulfilled, namely, the relief sought must intrude upon the state's sovereignty such that it constitutes the functional equivalent of relief the Eleventh Amendment bars. *Duke Energy*, 267 F.3d at 1053; *MacDonald*, 164 F.3d at 973. Hence, even when a lawsuit relates to the state's taxation system, *Ex parte Young* will apply if the relief sought does not rise to the level of interference with state sovereignty present in *Coeur d'Alene*. *See Agua Caliente*, 223 F.3d at 1048.

■■■ Here, defendants contend that the relief plaintiffs seek would require the state to alter its budget. They argue that plaintiffs' ADA claim therefore implicates the state's sovereign interest in controlling and prioritizing its budget.

A state's authority to control its budget is unquestionably an important state inter-

---

**13.** As the Court in *Coeur d'Alene* examined the deep historical roots of a state's sovereign interest in property, so too the court in *ANR Pipeline* noted that the power to tax has been "a hallmark of western legal tradition." 150 F.3d at 1193 n. 16 (quoting *The Federalist* No. 32) (Alexander Hamilton). But *ANR Pipeline* relied most heavily on the pronouncement of Congress in the passing the Tax Injunction Act of 1937, making its analysis roughly analogous to that of the court in *Barton*, which hinged on the express grant of unfettered discretion by Congress. *ANR Pipeline*, 150 F.3d at 1193; *Barton*, 293 F.3d at 954–55.

est. Nonetheless, virtually any prospective relief against a state will affect the state's budget. For this very reason, courts have held that an ancillary effect of prospective relief on a state's treasury does not violate Eleventh Amendment immunity. *See Edelman,* 415 U.S. at 668, 94 S.Ct. 1347 ("State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young* "). To adopt defendants' approach would expand *Coeur d'Alene* to the point that it would eviscerate *Ex parte Young.*

Furthermore, this case involves programs that are funded in part by federal money under Medicaid. Indeed, the subclass is defined as persons who, in addition to being class members, are also Medicaid recipients. As other courts have noted, a state's interest in administering a welfare program partially funded by the federal government is not a core sovereign interest. *Joseph A. ex rel. Wolfe,* 275 F.3d at 1261; *J.B. ex rel. Hart,* 186 F.3d at 1286. In sum, the Court finds that no special state sovereignty issue is at stake in this case. The first requirement for the application of *Coeur d'Alene* has not been satisfied.

■ Additionally, even if the state had a special sovereignty interest in prioritizing its budget, the Court would nonetheless find that the relief plaintiffs seek does not so intrude upon that interest that it constitutes a form of relief equivalent to one foreclosed by the Eleventh Amendment. The relief plaintiffs seek is prospective and against state officials, and any effect on the state treasury the remedy would require would be incidental.

Most remarkable in this regard is that plaintiffs affirmatively assert that by providing community-based services the state will spend considerably *less* than it does to house individuals in institutions. (*See* Third Am. Compl. (Doc. 331) at 44, 46). Plaintiffs in similar cases also have averred that community-based care is less expensive than institutional care. *See Olmstead v. L.C.,* 527 U.S. 581, 604, 119 S.Ct. 2176 (1999); *Helen L. v. DiDario,* 46 F.3d 325, 329, 338 (3rd Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995).[14] In these circumstances, the Court cannot say that the relief plaintiffs seek is so intrusive as to constitute the equivalent of relief barred by the Eleventh Amendment.

For the above reasons, the Court holds that plaintiffs' ADA and RA claims are not barred under the Eleventh Amendment.

**B. ADA and RA do not require new programs**

Defendants also maintain that the ADA and RA do not require them to create new Medicaid programs.[15] This argument is

---

**14.** Plaintiffs are prepared to introduce materials to establish this assertion. (*See* Mem. Contra (Doc. 351) at 6, citing, for example, General Accounting Office/Health Education and Human Services Division, *Successful State Efforts to Expand Home Services While Limiting Costs* 1 (Aug.1994)("[O]ne impact of the shift to home and community-based care is that the three states have been able to serve more people with the dollars available, primarily because home and community-based

care is less expensive per person than institutional care")). The Court, however, does not consider this material in connection with defendants' motion to dismiss.

**15.** Aside from this argument and the Eleventh Amendment issue, addressed above, defendants fail cogently to raise any other arguments for dismissal of plaintiffs' ADA claim. Defendants devote several pages of discussion to issues not addressed by *Olmstead*—such as

premised upon defendants' interpretation of the U.S. Supreme Court's landmark decision *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). Plaintiffs respond that they do not seek creation of new programs, but to require defendants to operate their current residential programs in a non-discriminatory manner as required under the *Olmstead*.

The significance of *Olmstead* cannot be overstated.[16] The outcome of this case may depend largely on *Olmstead*'s central holding that unnecessary institutionalization of persons with mental disabilities constitutes discrimination under the ADA, as well as the limitations the Court placed upon that basic concept.

A thorough understanding of *Olmstead* requires a historical perspective. The Court therefore will examine briefly the development of the law pertaining to the institutionalization of mentally retarded persons before it analyzes and applies *Olmstead*.

### 1. Pre-*Olmstead*

In the early years of our nation, mentally disabled persons were housed with their families, as well as in institutional settings such as jails and poorhouses. Jefferson D.E. Smith & Steve P. Calandrillo, *Forward to Fundamental Alteration: Addressing ADA Title II Integration Lawsuits After Olmstead v. L.C.*, 24 Harv. J.L. & Pub. Pol'y 695, 706 (2001)("Smith and Calandrillo"). The mid-nineteenth century saw the rise of larger public institutions resembling schools, which sought initially to train children who were slow to learn skills necessary to live in the community. Cerreto at 54. By the end of the nineteenth century, however, the school model was being abandoned in favor of asylums providing long-term care, as medical professionals and academics of the time advocated the need to protect society based on their perception that individuals with mental disabilities were more likely to be criminal, immoral, and a menace to society. Joanne Karger, Note, *"Don't Tread on the ADA": Olmstead v. L.C. Ex Rel. Zimring and the Future of Community Integration for Individuals with Mental Disabilities*, 40 B.C. L.Rev. 1221, 1225 (1999). Plaintiffs provide a chilling example of this sentiment in their third amended complaint, quoting an early superintendent of the Institution for Feeble–Minded Youth in Columbus, Ohio:

> In short, seclusion of the recognized, conceded, undeniable idiot or imbecile is the one remedy for a moral, social and physical condition that is acknowledged to be progressive, and that will, in time, if not arrested, slowly undermine and rot the very foundations of society and the state.

(Third Am. Compl. (Doc. 331) ¶ 313 at 36–37). By the 1960s, exposes of the appalling living conditions at several large state institutions fueled a movement toward reform. Cerreto at 55.

In the 1970s, Congress began to promulgate laws to improve conditions for persons with disabilities, including those living

whether the U.S. Constitution requires community placement for mentally retarded persons—but then neglect to show how this warrants dismissal of plaintiffs' ADA claim.

**16.** The title of one scholarly article vividly illustrates *Olmstead*'s importance. Mary C. Cerreto, *Olmstead: The Brown v. Board of Education for Disability Rights Promises, Limits, and Issues*, 3 Loy. J. Pub. Int. L. 47 (2001)("Cerreto"). On the other hand, one noted scholar recently lamented the apparent lack of impact *Olmstead* has had, as evidenced by the dearth of court decisions applying and interpreting it, and the relative scarcity of scholarly work on *Olmstead*. Michael L. Perlin, *"What's Good is Bad, What's Bad is Good, You'll Find Out When You Reach the Top, You're on the Bottom": Are the Americans With Disabilities Act (and Olmstead v. L.C.) Anything More Than "Idiot Wind?"*, 35 U. Mich. J.L. Reform 235, 255–60 (2002).

in institutions. *Id.* In 1973, Congress passed the Rehabilitation Act, 29 U.S.C. §§ 701–796*l*, which attempted to address the discrimination disabled persons had historically suffered. *See* 29 U.S.C. § 701. Congress's findings, purpose and policy statement emphasized the need to provide disabled individuals with tools necessary to achieve equality of opportunity, independent living, and full inclusion and integration in society. *Id.*

In 1976, Congress enacted the Developmentally Disabled Assistance and Bill of Rights Act ("DDABRA"). 29 U.S.C. §§ 6000–6083, repealed by the Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15001–15115. The DDABRA expressly included deinstitutionalization as one of its goals: "the treatment, services, and habilitation for a person with developmental disabilities ... should be provided in the setting that is least restrictive of the person's personal liberty." 42 U.S.C. § 6010(2). As a condition to federal funding, DDABRA required states to create agencies to protect the rights of developmentally disabled persons. 42 U.S.C. § 6042(a) (1995 ed.).[17] Unlike the RA, however, the DDABRA did not create substantive rights enforceable by a private right of action. *Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 11, 31, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Hence, until the ADA, the RA was the only means by which individuals with disabilities could challenge discrimination in the provision of public services.

The RA, however, was largely ineffective. As one circuit court observed:

Although Section 504 has been called "the cornerstone of the civil rights movement of the mobility-impaired",

*ADAPT v. Skinner,* 881 F.2d at 1205 (3d Cir.1989) (concurring opinion), its shortcomings and deficiencies quickly became apparent. *See, e.g.,* Cook, *The Americans with Disabilities Act: The Move to Integration,* 64 Temp. L.Rev. 393, 394–408 (1991) (The Rehabilitation Act and its regulations have been practically a dead letter as a remedy for segregated public services). One commentator has written that the weaknesses of section 504 arise from its statutory language, the limited extent of its coverage, inadequate enforcement mechanisms and erratic judicial interpretations. Burgdorf, *The Americans with Disabilities Act: Analysis and Implications of a Second–Generation Civil Rights Statute,* 26 Harv. C.R–C.L. L.Rev. 413, 431 (1991). *Helen L. v. DiDario,* 46 F.3d 325, 331 (3rd Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995).

In response to the RA's deficiencies, beginning in 1980, Congress undertook to enact a comprehensive and effective statute to address disability discrimination. Congress passed the Americans with Disabilities Act in 1990, 42 U.S.C. §§ 12101–12213. Designed as a comprehensive statutory scheme, the ADA seeks to eliminate disability discrimination on three fronts: employment (Title I, 42 U.S.C. §§ 12111–12117); public services offered by public agencies (Title II, 42 U.S.C. §§ 12131–12165); and public services and accommodations offered by private entities (Title III, 42 U.S.C. §§ 12161–12189). Plaintiffs in this case seek relief under Title II, which provides in part as follows:

[N]o qualified individual with a disability shall, by reason of such disability, be

---

**17.** Plaintiffs in the instant case are represented by such an agency, The Ohio Legal Rights Service ("OLRS"). The OLRS official website indicates "OLRS, an independent state agency, was created in 1975 by state law to protect and advocate the rights of people with mental disabilities, and is Ohio's federally designated Protection and Advocacy system and Client Assistance Program." Available at http://www.state.oh.us/olrs/programs.htm.

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such agency.

42 U.S.C. § 12132.

The ADA differs from the RA and other earlier acts in that it explicitly recognizes "institutionalization" and "segregation" as forms of discrimination against disabled individuals. 42 U.S.C. §§ 12101(a)(2), (3), and (5). Morever, unlike the RA, the ADA expressly commands the creation of implementing regulations. With respect to Title II, the ADA directs the U.S. Attorney to promulgate regulations to effect its requirements. 42 U.S.C. § 12134. Two regulations created under this mandate are particularly important to plaintiffs' ADA claims. The first is the integration regulation, which states: "A public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The second is the reasonable modifications regulation, which provides: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate conclusively that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

As indicated above, in 1981, Congress also amended Medicaid law, creating the Medicaid Home and Community–Based Services ("HCBS") waiver program. 42 U.S.C. § 1396n(c). The HCBS program provides federal Medicaid funding for

state-run home and community-based care to individuals who otherwise would require institutional care, provided the state can show that the average annual cost of home and community-based care does not exceed the average cost of institutional services. *Id.*

In a decision that foreshadowed *Olmstead,* the Third Circuit Court of Appeals examined the import of these two regulations in *Helen L. v. DiDario,* 46 F.3d 325 (3rd Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). In *Helen L.,* the plaintiff,[18] a resident of a Medicaid-funded nursing home, brought suit against the Secretary of Pennsylvania's Department of Public Services under Title II of the ADA, seeking injunctive relief to require the defendant to allow the plaintiff to participate in the community-based attendant care program. The plaintiff in *Helen L.* was paralyzed from the waist down as a result of meningitis, and began living in a nursing home in 1989. In 1993, she was evaluated and found eligible to participate in the attendant care program, which would have allowed her to live at home with her children but still receive needed assistance. She was placed on a waiting list, however, due to lack of funding for the attendant care program. This was despite the fact that the average cost of caring for a person in a nursing home was $45,000 per year, whereas the cost of caring for a person in the attendant care program was $10,500.[19]

The district court denied the plaintiff's motion for summary judgment, and entered judgment in favor of the defendant, reasoning that the plaintiff failed to state an ADA claim because the Common-

---

**18.** The appeal in *Helen L.* involved only one of the plaintiffs in that case, Idell S.

**19.** The Commonwealth paid forty-four percent of the cost of nursing home care, or an

average of $19,800 per year, and the federal government paid the difference. The Commonwealth paid the entire cost of the attendant care program. 46 F.3d at 329.

wealth's refusal to provide additional funding to the attendant care program was not on the basis of the plaintiff's disability. After a thorough examination of the ADA's purpose, history, and implementing regulations, the court of appeals in *Helen L.* reversed the judgment of the district court, holding "the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled." 46 F.3d at 333. Of particular importance to the court in *Helen L.* was the integration regulation, 28 C.F.R. § 35.130(d), which the court determined had "the force of law." 46 F.3d at 332. Nonetheless, the court in *Helen L.* acknowledged that the integration mandate was not absolute, noting that the ADA did not require a public entity to make fundamental alterations to its program, citing 28 C.F.R. § 35.130(b)(7). *Id.*

The defendant in *Helen L.* argued that to accommodate the plaintiff's request would require a fundamental alteration of its program. Specifically, the defendant maintained it was unable to fund the plaintiff's participation in the attendant care program because funds already had been appropriated for that fiscal year, and the Commonwealth's constitutional law prohibited shifting funds from one program to another. The court rejected the argument, stating that the plaintiff was not asking the defendant to alter its requirements for participation in the program, or for the substance of the program to be altered to accommodate her, and therefore was not seeking a fundamental alteration of the attendant care program. *Helen L.,* 46 F.3d at 337. The court in *Helen L.* vacated the judgment of the district court granting summary judgment in favor of the defendant, and remanded the case, ordering the district court to enter summary judgment in favor of the plaintiff. *Id.* at 339.

Thus, the stage was set for *Olmstead.*

### 2. Analysis of *Olmstead*

The plaintiffs in *Olmstead,* L.C. and E.W., were mentally retarded women. L.C. had been diagnosed with schizophrenia. E.W. had a personality disorder. Both women had been treated in institutional settings.

L.C. was voluntarily admitted to the psychiatric unit of a Georgia hospital in May 1992, where she was confined and received treatment. Her condition improved and, by May 1993, her treatment team at the hospital agreed that her needs could be met in one of the community-based programs supported by the state. She remained in the hospital until February 1996, when the state placed her in a community-based program.

E.W. was voluntarily admitted to the same Georgia hospital in February 1995 and also was confined in the psychiatric unit. In 1996, her treating psychiatrist concluded that community-based treatment would be appropriate for E.W.

In May 1995,[20] while still institutionalized at the Georgia hospital, L.C. filed an action in federal district court, challenging her confinement in a segregated setting under Title II of the ADA. She maintained that the state's failure to provide her services in its community care program, after her treating professionals had concluded that such placement was appropriate, violated the ADA. E.W. intervened, asserting the same claim.

The district court in *Olmstead* granted partial summary judgment in favor of the plaintiffs, holding that the state's failure to place the plaintiffs in a community-based

---

**20.** *Helen L.,* discussed above, was decided in January 1995. It seems fair to conclude that in filing suit a few months later the plaintiffs' counsel in *Olmstead* were responding to the extraordinary decision in *Helen L.*

treatment program violated the ADA. The district court rejected the state's argument that lack of funding rather than discrimination by reason of plaintiffs' disabilities was the reason plaintiffs had been kept in the state hospital. The district court specifically held that unnecessary institutional segregation of disabled persons was *per se* discrimination which lack of funding could not justify. The district court also rejected the state's fundamental alteration defense, concluding that the community-based programs in which plaintiffs sought to participate were already in place, and that the plaintiffs were qualified to participate in them. The district court also noted that the cost of treatment in the community was substantially less than the cost of providing treatment in an institution.

The Eleventh Circuit Court of Appeals affirmed the district court's judgment, but remanded for reconsideration of the state's lack of funding defense. *L.C. by Zimring v. Olmstead*, 138 F.3d 893, 905 (11th Cir.), *cert. granted*, 525 U.S. 1054, 119 S.Ct. 617, 142 L.Ed.2d 556 (1998), *aff'd in part, vacated in part, and remanded*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). After concluding that Congress sought to eliminate segregation in institutions as a form of discrimination by enacting the ADA, the court of appeals determined, as had the district court, that unjustified institutionalization of persons with mental disabilities violated ADA Title II. *L.C. by*

*Zimring*, 138 F.3d at 902. It disagreed, however, with the district court's absolute refusal to consider cost as a defense. *Id.* at 905. The court of appeals held that the ADA requires the state to expend additional funds to comply with the ADA's integration mandate unless the state can show the expenditures would be so unreasonable, given the demands of the state's mental health budget, that it would fundamentally alter the services it provides. *Id.*

The U.S. Supreme Court affirmed the court of appeals' decision in substantial part, vacated in part, and remanded the case for further proceedings. Delivering the Court's decision, Justice Ginsburg framed the issue as "whether the [ADA's] proscription of discrimination may require placement of persons with mental disabilities in community settings rather then in institutions." *Olmstead*, 527 U.S. at 587, 119 S.Ct. 2176. She expressed the Court's answer as "a qualified yes." *Id.*[21]

The Court began its analysis by examining the intent of Congress as evidenced by the ADA's language, history, and implementing regulations. The Court then turned to the state's arguments. The Court in *Olmstead* rejected the state's argument that no ADA violation had occurred because the denial of community placement was not "by reason of" the plaintiffs' disabilities, and that discrimination occurs only when similarly situated

---

**21.** Justice Ginsberg spoke for the majority insofar as her opinion concluded that unnecessary institutionalization violated the ADA. *Olmstead*, 527 U.S. at 587–603, 119 S.Ct. 2176. Justices O'Connor, Souter and Breyer joined in Justice Ginsburg's plurality opinion as to the scope of the fundamental alteration defense. *Id.* at 603–07, 119 S.Ct. 2176. Justice Stevens wrote separately on this issue, indicating as a procedural matter he would simply have affirmed the judgment of the court of appeals. *Id.* at 607–08, 119 S.Ct. 2176. Justice Kennedy wrote a separate concurring opinion to amplify the Court's con-

cern that the majority's holding should be applied with caution, so as to avoid pressuring the states into "attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition." *Id.* at 610, 119 S.Ct. 2176. He also expressed his understanding of the proper application of the majority's holding on discrimination, expressing that the case should have been remanded to determine whether such discrimination had actually been sufficiently alleged and supported by the plaintiffs' summary judgment materials. *Id.* at 611–615, 119 S.Ct. 2176.

individuals are treated differently. In doing so the Court noted that the U.S. Attorney General had concluded that unjustified institutionalization was a form of discrimination, as evidenced by the integration mandate regulation, 28 C.F.R. § 35.130(d), *Olmstead,* 527 U.S. at 596, 119 S.Ct. 2176, and that the Attorney General had "consistently advocated" this position in litigation well before the ADA. *Id.* at 597–98, 119 S.Ct. 2176. The Court concluded that this view was worthy of respect. *Id.* at 598, 119 S.Ct. 2176. The Court further observed that in enacting the ADA, Congress expressly recognized "segregation" as a form of discrimination against individuals with disabilities. *Id.* at 600, 119 S.Ct. 2176 (citing 42 U.S.C. §§ 12101(a)(2) and 12101(a)(5)).

The Court found two bases underlying the principle that unnecessary institutionalization is a form of discrimination. First, placing mentally disabled persons in institutions when they are capable of living in the community perpetuates the stereotypes that such individuals are unworthy or incapable of participating in community life. *Id.* Second, confinement in an institution deprives the individual of participation in a broad spectrum of important activities, such as "family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601, 119 S.Ct. 2176. The second basis entails dissimilar treatment. As the Court observed, "to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." *Id.*

The Court next considered who may be deemed a "qualified individual" in these circumstances under 42 U.S.C. § 12132. *Id.* at 602, 119 S.Ct. 2176. Affording the state some deference[22] as to qualification, the Court allowed that a state may rely on the reasonable assessments of its own professionals in deciding whether a person meets the essential eligibility requirements for participation in the state's community-based program. *Id.* Moreover, disabled individuals have the right to decline community-based treatment. *Id.*

Having established that unwarranted institutionalization may violate the ADA, the Court also considered limits on the state's duty to provide community-based treatment.[23] It therefore focused on the reasonable modifications regulation, 28 C.F.R. § 35.130(b)(7). *Olmstead,* 527 U.S. at 603–04, 119 S.Ct. 2176. Under the regulation, the state is required to make reasonable modifications to its practices, but is not required to fundamentally alter the nature of any program. 28 C.F.R. § 35.130(b)(7). The Eleventh Circuit Court of Appeals had limited consideration of the cost defense to the cost for accommodating the two plaintiffs in comparison to the state's entire mental health services budget. *L.C. by Zimring,* 138 F.3d at 905. The U.S. Supreme Court in *Olmstead* rejected the

---

**22.** *Olmstead* did not propose a specific standard for this deference. *Williams v. Wasserman,* 164 F.Supp.2d 591, 629 (D.Md.2001)(acknowledging lack of standard in *Olmstead*). *Olmstead* suggested, however, that it would not be enough for a plaintiff to merely show that reasonable professionals may have different opinions as to qualification. 527 U.S. at 603 n. 14, 119 S.Ct. 2176.

**23.** This portion of the *Olmstead* decision, Part III–B, 527 U.S. at 603–07, 119 S.Ct. 2176, represents the opinion of Justice Ginsburg, Justice O'Connor, Justice Souter, and Justice Breyer. Justice Stevens, who joined these Justices in Parts I, II, and III–A of *Olmstead,* declined to join Part III–B, as he would have simply affirmed the judgment of the court of appeals. 527 U.S. at 607–08, 119 S.Ct. 2176.

Eleventh Circuit's standard, recognizing that the cost of placing one or two individuals in a community-based treatment program would always be so small in comparison to the state's mental health budget that no state could possibly prevail on such a defense. 527 U.S. at 603–04, 119 S.Ct. 2176. The Court expressed the proper standard as follows:

> Sensibly construed, the fundamental-alteration component of the reasonable modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

*Id.* at 604, 119 S.Ct. 2176. The Court explained that the ADA was not intended to force the states to close institutions. *Id.* at 604–05, 119 S.Ct. 2176. Furthermore, the fundamental-alteration test must be applied in a manner that takes into account the state's need to maintain institutions for those individuals for whom community-based care may never be appropriate, as well as for those who may require institutionalization from time to time. *Id.* Moreover, forcing states to close institutions would give rise to the risk that states would simply move institutionalized persons to homeless shelters, as the state had in fact attempted with plaintiff E.W. *Id.* at 605, 119 S.Ct. 2176. The Court provided the following illustration for the defense: "If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable

pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met." *Id.* at 605–06, 119 S.Ct. 2176.[24]

In sum, two basic principles emerge from *Olmstead*. First, unnecessary institutionalization of mentally disabled persons, who are qualified to participate in an existing state community-based program, constitutes a form of discrimination by reason of disability prohibited by the ADA. Second, in evaluating the fundamental alteration defense, a court must carefully consider the state's legitimate interest in providing a variety of services for persons with mental disabilities, including institutional-based services, as well as the state's interest in allocating available resources fairly and evenhandedly. With these principles in mind, the Court turns to defendants' motion to dismiss.

### 3. Application to Defendants' Motion to Dismiss

 Before addressing defendants' specific argument that the ADA and RA do not require the creation of new programs, with reference to the essential elements set forth above, the Court will briefly examine whether plaintiffs have alleged facts sufficient to state a claim under the ADA, as interpreted by *Olmstead*. For purposes of examining the sufficiency of a complaint under Fed.R.Civ.P. 12(b)(6), the *Olmstead* decision is readily understood in terms of essential elements. Hence, to prevail on an ADA claim under *Olmstead*, a plaintiff must show:

> 1. The plaintiffs have a mental disability satisfying the ADA's disability requirement.

**24.** The Court agrees with defendants that the elements set forth in the quoted "example" are not an exclusive list of requirements that must be met in every case. This is not to say the Court has in mind any other way to present a defense, nor have defendants suggested any alternative.

2. The plaintiffs are institutionalized, or the plaintiffs are in need of services that are offered in the community-based program, but would have to submit to institutionalization to receive them.

3. The plaintiffs are qualified to participate in an existing, less restrictive state program for community-based care, giving due deference to the reasonable eligibility assessment of the state's own professionals.[25]

4. The plaintiffs' request for community-based services can be reasonably accommodated.[26]

5. The plaintiffs do not oppose participation in the state's existing program for community-based care.

6. The plaintiffs have nonetheless been excluded from participation in the program for community-based care.

*See* 527 U.S. at 587, 119 S.Ct. 2176.

■ Once the above elements have been satisfied, the state may present a defense that the relief the plaintiff requests would not require a reasonable modification of the program, but would fundamentally alter the nature of the program. *Id.* at 604, 119 S.Ct. 2176; 28 C.F.R. § 35.130(b)(7). Of course, whether requested relief would entail a fundamental alteration is a question that cannot be answered in the context of a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *See Lewis v. N.M. Dept. of Health*, 94 F.Supp.2d 1217, 1239 (D.N.M.2000), *aff'd*, 261 F.3d 970 (10th Cir.2001). The Court will proceed to examine whether plaintiffs have pleaded these elements.

■ First, the plaintiff representatives have pleaded specific facts establishing that they have mental disabilities that meet the ADA standard for disability. (*See, e.g.*, Third Am. Compl. (Doc. 331) ¶¶ 10–15 at 3–4). Additionally, the class definition limits the class to individuals with mental retardation and developmental disabilities. (Third Am. Compl. (Doc. 331) ¶ 246 at 26).

Second, the named plaintiffs aver that they have been institutionalized,[27] and the third amended complaint indicates that class members are either institutionalized or live at home but are in need of commu-

---

25. From the standpoint of reviewing a pleading under Fed.R.Civ.P. 12(b)(6), the deference afforded the state's professionals is tempered by the mandate to view the pleaded facts in the light most favorable to the party opposing the motion to dismiss. This element would be satisfied either by pleading that the state's professionals have determined the plaintiffs are qualified for community-based care, or by pleading facts from which it may be inferred that the determinations of the state's professionals are manifestly unreasonable.

26. *Olmstead* was unclear as to which side bears the burden of proving that the relief sought can be reasonably accommodated. *Compare*, 527 U.S. at 587, 119 S.Ct. 2176 (apparently listing reasonable accommodation among the essential elements) *with* 527 U.S. at 606, 119 S.Ct. 2176 (arguably suggesting the state has burden of showing reasonable modification). The plaintiff in an ADA Title II action bears the burden of show-

ing that a reasonable modification is available. *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir.2002). Once the plaintiff meets the burden of demonstrating this element, along with the other prima facie elements, the burden then shifts to the state to show that the requested accommodation is not reasonable. *Id.* This allocation of burdens is consistent with the structure of the reasonable modification regulation, which only speaks of the public entity's burden with respect to fundamental alteration, not the reasonable modification. *See* 28 C.F.R. § 35.130(b)(7). *Colo. Cross Disability Coalition v. Hermanson Family Ltd.*, 264 F.3d 999, 1005–06 (10th Cir.2001)(adopting same standard for ADA Title III claims).

27. Whether the plaintiff representatives remain institutionalized through the duration of this litigation is irrelevant. *Olmstead*, 527 U.S. at 594 n. 6, 119 S.Ct. 2176.

nity-based services. (Third Am. Compl. (doc. 331) ¶ 3 at 1).

Third, plaintiffs allege that in some instances the State of Ohio's professionals have determined the named plaintiffs as qualified to participate in community-based programs. (*See, e.g.,* Third Am. Compl. (Doc. 331) ¶ 25 at 4). They also allege that in other instances, the assessments of the named plaintiffs by the State's professionals have been inadequate. (*See, e.g.,* Third Am. Compl. (Doc. 331) ¶¶ 49, 50 at 7). Plaintiffs assert that the lack of adequate evaluation is class-wide. (Third Am. Compl. (Doc. 331) ¶¶ 289, 290, 291 at 33–34). These allegations are sufficient to avoid dismissal under Fed.R.Civ.P. 12(b)(6). *Frederick L. v. Dept. of Pub. Welfare,* 157 F.Supp.2d 509, 540 (E.D.Pa. 2001).

Fourth, plaintiffs allege that providing services in the community will cost less than providing the same services in institutions. (Third Am. Compl. (Doc. 331) ¶ 389 at 44 and ¶ 411 at 46). Moreover, plaintiffs maintain that the State has failed to provide matching funds for existing HCBS waiver slots, and may request additional waiver slots to expand community-based services. The Court finds that for purposes of pleading, plaintiffs have satisfied the reasonable accommodation element.

Fifth, the third amended complaint indicates that each of the plaintiff representatives desires to live and participate in the community, or at least do not oppose doing so. (*See, e.g.,* Third Am. Compl. (Doc. 331) ¶¶ 52, 53, 54 at 7). Although the class definition does not specifically aver that class members desire community-based services, it is arguably fair to infer this.[28] These allegations fulfill the liberal pleading standard of Fed.R.Civ.P. 8. *Frederick L.,* 157 F.Supp.2d at 540.

The denial of community-based services is the core assertion in plaintiffs' third amended complaint, and thus the sixth element is also pleaded.

Turning to defendants' motion, as noted above, the only argument defendants cogently advance for dismissal of plaintiffs' ADA and RA claims, other than Eleventh Amendment immunity, is that the ADA and RA do not require them to create new programs.[29] In support of the proposition that this principle requires dismissal of plaintiffs' ADA and RA claims, defendants cite *Rodriguez v. City of New York,* 197 F.3d 611 (2nd Cir.1999). The plaintiffs in *Rodriguez,* representing a class of mentally disabled medicaid recipients, were already participating in a home-care program. They brought their action against the City of New York, asserting that the city failed to provide safety monitoring

---

[28] For example, paragraph 14 of plaintiffs' prayer for relief alludes to requiring defendants to ensure that alternative placement is the result of individual subclass members' choice. (Third Am. Compl. (Doc. 331) ¶ 14 at 72).

[29] In their reply memorandum, defendants present the following analogy:

Let's assume that a governmental entity operates a bus system to provide transportation to all citizens, including the disabled. The Defendants take the position that the ADA would require that the bus system be operated in a nondiscriminatory fashion. The Plaintiffs take the position that not only

does the ADA require nondiscrimination as to existing bus service, but that the ADA can also force the governmental entity to expand the bus service so that all disabled individuals have access to the bus.

(Reply Mem. (Doc. 359) at 2). The analogy mischaracterizes plaintiffs' position. More significantly, however, the position it seems to espouse is essentially that of Justice Thomas in his dissenting opinion in *Olmstead. See* 527 U.S. at 615–26, 119 S.Ct. 2176 (joined by Rehnquist, C.J., and Scalia, J.). As such, the analogy is not so much an argument as it is an expression of defendants' wish that *Olmstead* had been decided in accordance with Justice Thomas's dissent.

services and other personal care services. The plaintiffs asserted claims under ADA Title II, the RA and Medicaid law, arguing that without safety monitoring, the existing services were inadequate to meet their medical needs and allow them to live in the community. The district court granted plaintiffs a permanent injunction. The Second Circuit reversed on the basis that plaintiffs sought a new service that the city had not provided to anyone. *Rodriguez*, 197 F.3d at 619.

■ In the case at bar, plaintiffs do not seek new programs; rather they seek to participate in waiver programs that already exist. Although generally instructive, *Rodriguez* is inapposite. In addition, as the Court stated in its earlier decision, it would be improper to dismiss a claim under Fed.R.Civ.P. 12(b)(6) on the assumption that the Court will grant plaintiffs a remedy requiring defendants to create new programs. *Martin*, 840 F.Supp. at 1195. Ultimately, whether expansion of a program in this case constitutes a fundamental alteration is a matter that can be resolved only by a careful examination of all of the facts and circumstances in this case, and not on the basis of pleadings or assumptions. The Court rejects defendants' argument that they are entitled to dismissal of plaintiffs' RA and ADA claims on the basis that plaintiffs seek to enjoin defendants to create new programs.

For the above reasons, the Court denies defendants' motion to dismiss plaintiffs' RA and ADA claims.

### C. Section 1983 Medicaid law claims

The third prong of defendants' motion to dismiss challenges claims plaintiffs bring under Medicaid law pursuant to 42 U.S.C. § 1983. In support of this prong, defendants advance two basic arguments: (1) plaintiffs' string citation of regulations fails to state a claim due to lack of specificity; and (2) 42 U.S.C. § 1396a(a) does not create rights which plaintiffs may enforce against defendants under § 1983.

### 1. String Citations

■ The third amended complaint contains citations to numerous federal regulations promulgated under the ADA and Medicaid statutes, as well as citation to the Ohio Administrative Code. In most instances, plaintiffs' citations to regulations are specific. Paragraph 415 [30] of the third amended complaint, however, states repeatedly that defendants violated "42 C.F.R. § 483.100–483.138." [31] Plaintiffs assert that the Court rejected defendants' argument in its earlier decision, *Martin*, 840 F.Supp. at 1201.

The regulations at issue are part of Medicaid law governing preadmission screening and annual resident review, or PASARR, which consists of both regulations and statutory provisions, 42 U.S.C. §§ 1396a(a)(28) and 1396r(e)(7). As plaintiffs suggest, the Court discussed the PASARR provisions in its earlier decision. *See Martin*, 840 F.Supp. at 1197–1202. The discussion was in the context of the test for determining whether PASARR included rights plaintiffs could enforce under 42 U.S.C. § 1983. In part, the Court found that the detailed guidance and definitions contained in the PASARR regulations provided the clarity required to conclude that PASARR's preadmission screening requirements are enforceable by

---

**30.** The third amended complaint sets forth paragraphs 1 through 507, and then on page 60 begins again at number 398, resulting in some duplication of paragraph numbers. The paragraph at issue here is the second number 415, which appears on pages 64–65 of the third amended complaint.

**31.** In addition to the above example, in paragraph 498 of the third amended complaint, plaintiffs refer to "45 C.F.R. §§ 84, *et seq.*" Defendants, however, do not specifically object to this reference.

plaintiffs. *Id.* The Court did not, however, address the precise issue defendants raise now, namely whether the citation of the regulations in the third amended complaint is deficient in some manner, rendering the claim subject to dismissal.

Defendants contend that plaintiffs' use of string citation prevents the Court from applying the test to determine whether the federal law creates a right plaintiffs can enforce under 42 U.S.C. § 1983. Defendants maintain that, as a result, plaintiffs fail to state any claim upon which relief may be granted under the subject regulations.

The real issue is, quite simply, whether the third amended complaint satisfies the liberal pleading requirements of Fed. R.Civ.P. 8, namely, "a short and plain statement of the claim showing that the pleader is entitled to relief." Each subpart of paragraph 415, A–J, consists of a specific factual allegation of defendants' failure to comply with federal Medicaid law, followed by a citation of the relevant federal statute, followed in turn to the string citation of the PASARR regulations to which defendants object. Viewed in context, the challenged string citations merely represent plaintiffs' understanding that the regulations provide the requisite guidance and definitions that led the Court to conclude in its earlier decision that the statutory provisions set forth rights enforceable under § 1983. As such, the string citations do not provide a basis for dismissal of any part of plaintiffs' Medicaid law claims. Furthermore, the factual allegations preceding each citation satisfy Rule 8.

The Court denies this branch of defendants' motion to dismiss.

### 2. 42 U.S.C. § 1396a(a)

Defendants also argue that 42 U.S.C. § 1396a(a) does not provide plaintiffs federal rights enforceable under § 1983.

Plaintiffs assert several claims under § 1396a(a)(1):

1. Defendants' programs for community-based care through waivers are not offered consistently among Ohio's counties, and therefore the programs fail to satisfy the state-wideness requirement of 42 U.S.C. § 1396a(a)(1).

2. Defendants have failed to ensure that Medicaid services are equal in amount, duration, and scope regardless of the county in which they are provided, in violation of 42 U.S.C. § 1369a(1)(a)(10)(B).

3. Defendants have failed to ensure that Medicaid services are provided with reasonable promptness as required by 42 U.S.C. § 1396a(a)(8).

4. Defendants violate the freedom of choice provision of 42 U.S.C. § 1396a(a)(23) by prohibiting county MR/DD boards from contracting providers outside the purchase of service ("POS") system, and not allowing new providers to enter the system.

Plaintiffs seek to enforce these requirements under 42 U.S.C. § 1983, which provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. In its earlier decision in this case, the Court set forth and applied the standard for determining whether a federal law gives rise to a private right of

action under § 1983. *Martin*, 840 F.Supp. at 1195. More recently, the Sixth Circuit Court of Appeals characterized the test succinctly as follows:

A statute will be found to create an enforceable right if, after a particularized inquiry, the court concludes (1) the statutory section was intended to benefit the putative plaintiff, (2) it sets a binding obligation on a government unit, rather than merely expressing a congressional preference, and (3) the interests the plaintiff asserts are not so " 'vague and amorphous' that [their] enforcement would strain judicial competence." *Id.* at 341, 117 S.Ct. 1353 (quoting *Wright v. Roanoke Redevel. and Housing Auth.*, 479 U.S. 418, 437, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). If these conditions are met, we presume the statute creates an enforceable right unless Congress has explicitly or implicitly foreclosed this. *See Blessing*, 520 U.S. at 341, 117 S.Ct. 1353.

*Westside Mothers*, 289 F.3d at 862 (quoting *Blessing v. Freestone*, 520 U.S. 329, 341, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)). The Court will proceed to examine plaintiffs' Medicaid claims under this standard.

### 1. Statewide requirement

■ Defendants contend that the statewide requirement of § 1396(a)(1) does not provide a private right of action which plaintiffs may enforce through 42 U.S.C. § 1983. Section 1396a(a)(1) provides:

A State plan for medical assistance must—

(1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them.

42 U.S.C. § 1396a(a)(1). The Court finds that plaintiffs and members of the subclass, as Medicaid recipients, are the intended beneficiaries of the provision. "Must provide" satisfies the requirement that the federal law was intended to bind the state. There is no indication that Congress has foreclosed enforcement of this provision under § 1983. *See Wilder v. Va. Hosp. Ass'n.*, 496 U.S. 498, 520–21, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)(Medicaid Act contains no expression of Congressional intent to prevent private enforcement).

Nonetheless, the Sixth Circuit Court of Appeals has held that requirements of the statute and the accompanying regulation, 42 C.F.R. § 431.50 [32], are too vague to

---

**32.** 42 C.F.R. § 431.50 states:

(a) Statutory basis. Section 1902(a)(1) of the Act requires a State plan to be in effect throughout the State, and section 1915 permits certain exceptions.

(b) State plan requirements. A State plan must provide that the following requirements are met:

(1) The plan will be in operation statewide through a system of local offices, under equitable standards for assistance and administration that are mandatory throughout the State.

(2) If administered by political subdivisions of the State, the plan will be mandatory on those subdivisions.

(3) The agency will ensure that the plan is continuously in operation in all local offices or agencies through—

(i) Methods for informing staff of State policies, standards, procedures, and instructions;

(ii) Systematic planned examination and evaluation of operations in local offices by regularly assigned State staff who make regular visits; and

(iii) Reports, controls, or other methods.

(c) Exceptions.

(1) "Statewide operation" does not mean, for example, that every source of service must furnish the service State-wide. The requirement does not preclude the agency from contracting with a comprehensive health care organization (such as an HMO or a rural health clinic) that serves a specific area of the State, to furnish services to Medicaid recipients who live in that area and chose to receive services from that HMO or rural health clinic. Recipients who live in other parts of the State may receive their services from other sources.

(2) Other allowable exceptions and waivers are set forth in §§ 431.54 and 431.55.

provide a basis for judicial enforcement. *Boatman v. Hammons,* 164 F.3d 286, 292 (6th Cir.1998).[33] Plaintiffs attempt to distinguish *Boatman* on the facts, but the Court finds their arguments on this point unpersuasive. Whether a provision of federal law is enforceable under § 1983 is not a matter of the facts of the case, but the precise language of the provision at issue. *See Martin,* 840 F.Supp. at 1195. Here, the same statute and regulation are at issue, and *Boatman* stated that the statewide requirement of 42 C.F.R. § 431.50, and implicitly 42 U.S.C. § 1396a(a)(1), was too vague to enforce. 164 F.3d at 292. Under the *Boatman* decision, which is binding upon this Court, defendants are entitled to dismissal of plaintiffs' § 1983 claims under Medicaid's statewide provisions.

### 2. Comparability of services for categorically needy

 Defendants likewise argue that plaintiffs do not have a private right of action under § 1396a(a)(10)(B), which provides:

A State plan for medical assistance must—

(10) provide—

 * * * * * *

(B) that the medical assistance made available to any individual described in subparagraph (A)—

(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and

(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A).

42 U.S.C. § 1396a(a)(10)(B). Subparagraph (A) describes the various needy individuals to whom medical assistance must be provided. 42 U.S.C. § 1396a(10)(A). The categories set forth in subsection (A) include the "categorically needy," who lack sufficient income to meet their basic needs, and the "medically needy," who may have resources to meet their basic needs, but who cannot meet their medical needs without assistance. *Id.*

As with § 1396a(a)(1), § 1396a(a)(10)(B) was intended to benefit plaintiffs, who are Medicaid recipients, as well as the subclass. Section 1396a(a)(10)(B) is also stated unmistakably in mandatory terms. Once again, Congress has given no indication that it intended to foreclose a private action as a remedy for violation of this provision.

The concept of comparability and equality expressed in the phrase "not less than" is neither vague nor is it ambiguous. A comparison of the amount, duration and scope of services would entail a complex factual inquiry. Nonetheless, such a comparison would not be beyond the complexity of other matters courts regularly address. More importantly, if the Court finds that comparable services are not made available as required under § 1396a(a)(10)(B), the Court is confident that it could frame an appropriate equitable remedy. The Court concludes that the comparability of services provision is enforceable under § 1983.

Two other district courts have held that § 1396a(a)(10)(B) is enforceable under § 1983. *Antrican v. Buell,* 158 F.Supp.2d 663, 670 (E.D.N.C.2001), *aff'd,* 290 F.3d 178 (4th Cir.2002); *Sobky v. Smoley,* 855 F.Supp. 1123, 1134 (E.D.Cal.1994). Other courts have assumed, without expressly ruling, that the comparability provision is enforceable in a private action. *See Rodri-*

---

**33.** At least two district courts have reached the opposite conclusion. *Antrican v. Buell,* 158 F.Supp.2d 663, 670 (E.D.N.C.2001), *aff'd,* 290 F.3d 178 (4th Cir.2002); *Sobky v. Smoley,* 855 F.Supp. 1123, 1134 (E.D.Cal.1994).

*guez,* 197 F.3d at 616; *Blanchard v. Forrest,* 71 F.3d 1163, 1167–68 (5th Cir.1996); *Mass. Assn. of Older Ams. v. Sharp,* 700 F.2d 749, 750, 753 (1st Cir.1983).

■ Defendants also argue that plaintiffs' comparability claim fails because plaintiffs have not pleaded expressly that they are "categorically needy" under 42 U.S.C. § 1396a(a)(10)(B). The Court disagrees. Under the concept of notice pleading, plaintiffs are not required to plead "magic words" to state a claim. *Martinez v. Hooper,* 148 F.3d 856, 858–59 (7th Cir.1998). The Court is satisfied that plaintiffs have pleaded facts from which the Court can reasonably infer that each plaintiff representative is categorically needy.

For these reasons, the Court denies defendants' motion to dismiss plaintiffs' comparability claim.

### 3. Reasonable promptness

■ Defendants also maintain that the reasonable promptness requirement of § 1396a(a)(8) does not provide plaintiffs with a claim enforceable under § 1983. Section 1396a(a)(8) states as follows:

A State plan for medical assistance must—

(8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.

42 U.S.C. § 1396a(a)(8).

As before, plaintiffs and the subclass are intended beneficiaries, and "must" connotes a mandatory requirement. No congressional intent to foreclose enforcement under § 1983 is evident.

"Reasonableness" is a legal term of art with which all courts are familiar, and courts are frequently called upon to make determinations as to what is reasonable, including what constitutes a reasonable period of time. *See, e.g.,* U.C.C. § 2–309 (1998). The Court finds that the concept of reasonable promptness in the provision of Medicaid services is not so vague or amorphous as to strain judicial competence. *See Doe 1–13 v. Chiles,* 136 F.3d 709, 718 (11th Cir.1998); *Antrican,* 158 F.Supp.2d at 671; *Bryson v. Shumway,* 177 F.Supp.2d 78, 94 (D.N.H.2001); *Boudreau v. Ryan,* No. 00–C–5392, 2001 WL 840583, at *9 ( N.D.Ill. May 2, 2001); *Sobky,* 855 F.Supp. at 1147.

■ The reasonable promptness provision meets all of the criteria for enforcement under § 1983. Defendants, however, also move to dismiss this claim on the basis that plaintiffs inadvertently referred to § 1396a(a)(18). Plaintiffs' third amended complaint alleges that defendants have violated plaintiffs' rights under Medicaid law by failing to provide services with reasonable promptness. The Court finds that plaintiffs' use of the term "reasonable promptness" is sufficient to give defendants notice of a claim under 42 U.S.C. § 1396a(a)(8), despite plaintiffs' erroneous reference to subsection (18). The Court, however, would grant plaintiffs leave to file a fourth amended complaint to cure this typographical error if they decided to do so.

For the above reasons, the Court therefore denies defendants' motion to dismiss plaintiffs' reasonable promptness claim.

### 4. Free choice of providers

■ Defendants contend that the free choice provision of § 1396a(a)(23) is unenforceable. The statute provides:

A State plan for medical assistance must—

(23) provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform

the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services, and (B) an enrollment of an individual eligible for medical assistance in a primary care case-management system (described in section 1396n(b)(1) of this title), a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title.

42 U.S.C. § 1396a(a)(23). There is no question that the free choice provision is enforceable. *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). At a minimum, it confers an absolute right to continue to receive services from a qualified provider. *Id.*

▮▮▮▮▮ The extent of this right is not absolute, however, and does not include a right to receive services from a provider who is not qualified. *Id.* Furthermore, it does not obligate a state to pay a provider's charges without reference to the state's schedule of charges of its standards of care. *Antrican*, 158 F.Supp.2d at 671.

Here, plaintiffs allege that defendants prohibit county MR/DD boards from contracting with residential providers outside the purchase of service ("POS") system, and do not allow new residential providers to enter the system. This, in turn, limits plaintiffs' freedom of choice among residential providers. The Court finds that plaintiffs state a cognizable claim under § 1396a(a)(23). The Court denies defendants' motion to dismiss plaintiffs' free choice claim.

### D. Due process claims

In the fourth and final prong of their motion to dismiss, defendants challenge plaintiffs' due process claims asserted under *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452 (1982). Defendants contend that as the Court ruled in its earlier decision, plaintiffs claims under *Youngberg* are limited to class members who have been committed involuntarily, and cannot include a claim for community-based services. Plaintiffs openly acknowledge these limitations.

In these circumstances, the Court declines to dismiss plaintiffs' *Youngberg* claims, and instead reaffirms its earlier ruling limiting such claims. *Martin*, 840 F.Supp. at 1207.

### V. Plaintiffs' Motion for Summary Judgment

Whereas defendants' motion to dismiss was a scattergun effort, which sought dismissal of all of plaintiffs' claims, plaintiffs' summary judgment motion is a rifle shot aimed at a declaratory judgment on plaintiffs' centerpiece claim that defendants' failure to provide them with community-based services violates the ADA under *Olmstead*.

### A. Standard of Review

The standard governing summary judgment is set forth in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the

opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence.[34] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Although the Court views the entire record, it disregards all evidence favorable to the moving party that the jury is not required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479–80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris,* 260 F.3d 654, 665 (6th Cir.2001).

### B. Essential Elements

Plaintiffs maintain that there are no genuine issues of material fact as to any of the essential elements of their ADA claim or the fundamental alteration defense. The Court will begin its inquiry by examining whether plaintiffs have established the essential elements of an ADA claim under *Olmstead* as a matter of law. As noted above, to prevail on an ADA claim under *Olmstead,* plaintiffs must show:

**34.** In its review of defendants' motion to dismiss, the Court accepted as true the well-pleaded facts set forth in the third amended complaint. In contrast, the analysis of plaintiffs' motion for partial summary judgment does not require the Court to extend any deference to plaintiffs' factual assertions, and indeed demands that the Court construe the evidence in the light most favorable to the nonmoving parties, the defendants. The difference between the standards is crucial, and a claim that survives a motion to dismiss is by no means guaranteed to prevail on summary judgment.

1. The plaintiffs have a mental disability satisfying the ADA's disability requirement.

2. The plaintiffs are institutionalized, or the plaintiffs are in need of services that are offered in the community-based program, but would have to submit to institutionalization to receive them.

3. The plaintiffs are qualified to participate in an existing, less restrictive state program for community-based care, giving due deference to the reasonable eligibility assessment of the state's own professionals.

4. The plaintiffs' request for community-based services can be reasonably accommodated.

5. The plaintiffs do not oppose participation in the state's program for community-based care.

6. The plaintiffs have nonetheless been excluded from participation in the program for community-based care.

*See* 527 U.S. at 587, 119 S.Ct. 2176.

### 1. Disability

■ Defendants do not contest this element. The undisputed evidence shows that plaintiffs are disabled within the meaning of the ADA. Their mental retardation, developmental disability and other disabilities substantially limit one or more major life activities. Furthermore, the class definition limits members to those individuals who are mentally retarded or developmentally disabled, and both conditions qualify as disabilities. The Court finds that plaintiffs have established the first element as a matter of law.

### 2. Institutionalized

■ Defendants argue that the *Olmstead* decision is limited to state-run insti-

tutions. Mem. contra (doc. 370) at 6. Defendants present this argument in a single sentence, (Mem. Contra (Doc. 370) at 6), and cite no authority for the proposition. The integration mandate requires defendants to "administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Thus, ADA applies to *"services, programs and activities,"* and liability does not hinge upon whether the setting in question is owned or run directly by the State. *Id.* (Italics supplied). Nor does it matter whether the institution is one with hundreds of beds, or a smaller fifty bed ICF/MR or nursing facility, inasmuch as the mandate requires the provision of services in *"the most integrated setting appropriate." Id.* (Italics supplied).

■ The undisputed evidence shows that each of the plaintiff representatives are or were [35] housed in institutions. The class consists of those who are or will be in need of community-based services, and this necessarily would include persons who are either in institutions or who are not in institutions but can receive the services they need only if they submit to institutionalization. The undisputed facts demonstrate that when plaintiffs filed their motion for summary judgment, about 12,000 class members were on waiting lists to receive community-based services. The Court finds that plaintiffs have satisfied this element as a matter of law.

### 3. Qualified to participate in program for community-based care

■ Defendants argue that plaintiffs have failed to present evidence on this element. ( Mem. contra (Doc. 370) at 8).

---

**35.** As noted above, whether plaintiff representatives remain institutionalized through the duration of this litigation is irrelevant. *Olmstead,* 527 U.S. at 594 n. 6, 119 S.Ct. 2176.

*Olmstead* requires the Court to give deference to the reasonable determinations of the State's professionals as to whether individuals are qualified to participate in a community-based program. 527 U.S. at 602, 119 S.Ct. 2176. But the extension of such deference is not an essential element of plaintiffs' case, rather it is a limitation upon the class of individuals a court may deem properly qualified under the ADA. *See id. Olmstead* cannot reasonably be read as containing a rigid requirement that plaintiffs must offer evidence as the opinion of the state's professionals to satisfy this element.

Here, however, there are no determinations to which the Court may defer. Defendants have not attempted to introduce any evidence, or even an argument, that any State professionals have deemed any of the named plaintiffs or class members unsuitable to receive services in the community.

Plaintiffs have submitted the only evidence in the record on this issue. It consists of the State's waiting lists of individuals who seek community-based services,[36] and a few references to testimony by the parties' purported experts. Plaintiffs aver that by operation of Ohio law, only qualified individuals may appear on these lists. Plaintiffs rely on Ohio Rev.Code § 5126.042(G), which provides as follows:

> Prior to placing an individual on a waiting list, the county board shall assess the service needs of the individual in accordance with all applicable state and federal laws. The county board shall place the individual on the appropriate waiting list and may place the individual on more than one waiting list. The county board shall notify the individual of the individual's placement and position on each waiting list on which the individual is placed.

> At least annually, the county board shall reassess the service needs of each individual on a waiting list. If it determines that an individual no longer needs a program or service, the county board shall remove the individual from the waiting list. If it determines that an individual needs a program or service other than the one for which the individual is on the waiting list, the county board shall provide the program or service to the individual or place the individual on a waiting list for the program or service in accordance with the board's policy for waiting lists.

Ohio Rev.Code § 5126.042(G). Plaintiffs ask the Court to hold that a county board's determination that an individual needs a service is equivalent to a determination that such individuals are qualified to participate within the meaning of the ADA. In essence, plaintiffs ask the Court to invoke the ancient maxim *omnia praesumuntur rite esse acta*, and presume that the county boards have acted in accordance with the requirements of Ohio law. *See N.L.R.B. v. Wiltse*, 188 F.2d 917, 920 (6th Cir), *cert. denied*, 342 U.S. 859, 72 S.Ct. 87, 96 L.Ed. 647 (1951). Defendants make no attempt whatsoever to address this argument let alone refute it. The Court finds defendants' failure to respond to this contention both perplexing and troubling.

It may in fact be the case that placement on the list on the basis of need is a determination that the individual is qualified to participate for purposes of the ADA. Given the procedural posture of this matter, however, the Court declines to hold as a matter of law that everyone on a waiting list for community-based services is automatically a qualified individual under the ADA. Plaintiffs move for summary judgment. The standard for reviewing their motion requires the Court to view

---

**36.** Plaintiffs do not attempt to prove separately that each individual class representative is qualified for participation in a community-based program.

the evidence in the light most favorable to the nonmoving party, namely, defendants. *Reeves*, 530 U.S. at 150–51, 120 S.Ct. 2097. Although the conceptual gap between need for services and qualification may not be cavernous, it is a gap nonetheless. On the one hand, it would seem reasonable to infer that in determining a need for services, the county board is also necessarily determining qualification. On the other hand, it is equally plausible that the determination of need for services is made upon a lower threshold than qualification for participation as contemplated by the ADA. That is, listed individuals may be deemed in need on the basis that one or more aspect of community-based services are viewed as potentially beneficial to that individual. That an individual may receive some benefit does not necessarily ensure that all requirements for qualification have been met. Hence, competing inferences may be drawn from the evidence plaintiffs submit.

The same is true of the ambiguous fragments of expert testimony plaintiffs refer to in their reply memorandum. (*See* Reply Mem. (Doc. 373) at 12 (block quoting an unintelligible excerpt from the deposition of plaintiffs' expert)). Such assertions, limited and open to interpretation, do not establish the element of qualification as a matter of law.[37]

On the present record, and in the procedural posture of a plaintiffs' motion for summary judgment, the Court cannot say as a matter of law that plaintiffs or individuals on waiting lists are qualified for participation in a community-based program within the meaning of the ADA. The final determination of this issue will require a careful examination of the need for service determination, as well as other evidence, given plaintiffs' alternative allegation that such reviews are inadequate.

In short, genuine issues of material fact exist as to whether plaintiffs and persons on waiting lists are qualified to participate in community-based services under the ADA. For this reason alone, the Court denies plaintiffs' motion for summary judgment. The Court will nevertheless examine the remaining elements as an alternative basis for its decision and for the sake of judicial economy.

#### 4. Reasonable accommodation

In general, plaintiffs seem to misconstrue the import of the reasonable accommodation element. First, plaintiffs appear to erroneously place the burden on defendants to show that they cannot reasonably accommodate plaintiffs' request for community-based services. (Mot.Summ. J. (Doc.364) at 19). The initial burden of demonstrating that a reasonable accommodation is available rests with plaintiffs. *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir.2002). Once the plaintiff meets the burden of demonstrating this element, along with the other prima facie elements, the burden then shifts to the State to show that the requested accommodation is not reasonable. *Id.*

Second, plaintiffs focus exclusively on the example *Olmstead* provided for the reasonable modification/fundamental alteration analysis: "If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met." 527 U.S. at 605–06, 119 S.Ct. 2176. Nothing in the *Olmstead* decision suggests that this illustration was meant to express the exclusive means for

---

**37.** In fairness, properly presented and supported, such evidence may be sufficient to withstand a motion for summary judgment by defendants.

determining the reasonable accommodation issue. Indeed, the use of the word "example" implies the opposite. The quoted language is but one way a defendant may prevail if the plaintiff proves a prima facie case. If the defendant fits the example, it has essentially proven that it has *already reasonably accommodated* the plaintiff's request for participation in a community-based program. The presence or absence of an existing state plan and a waiting list that moves at a reasonable pace does nothing whatsoever to answer whether, in the first instance, a reasonable modification is available.

■■■ In its analysis of defendants' motion to dismiss, the Court found that plaintiffs had adequately pleaded the availability of a reasonable accommodation. Plaintiffs did so by asserting that it costs the State less to offer community-based services than it does to provide the same services in institutions, and by alleging the availability of additional Medicaid waivers from the federal government. It is possible, if not likely, that the record contains some material to support these basic assertions.[38] The Court, however, will not comb the record for such evidence, as it is not required to do so. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). In these circumstances, plaintiffs' motion for partial summary judgment is not supported as required under Fed. R.Civ.P. 56. In addition, as *Olmstead* requires a far more involved inquiry than cost per individual; it directs the Court to consider all of the demands on the State's mental health budget, as well as the State's legitimate interest in maintaining a broad range of services to address the different needs of individuals. 527 U.S. at 604, 119 S.Ct. 2176.

The Court finds that genuine issues of material fact on the issue of whether the relief plaintiffs seek is reasonable accommodation. For this additional reason the Court denies plaintiffs' summary judgment motion.

### 5. Non-opposition to community-based services

With the exception of plaintiff representative Warren B., defendants do not contest that the named plaintiffs have expressed the desire to live in the community.[39] Defendants acknowledge that it would be inappropriate to determine whether class members desire to receive services in a community setting until after qualified class members are identified.

### 6. Exclusion

Defendant does not appear to dispute that plaintiffs and class members are or have been denied participation in community-based programs. The Court finds that this element is satisfied as a matter of law.

Based on the above, the Court concludes that genuine issues of material facts exist as to two essential elements of plaintiffs' ADA claim, namely, qualification and the availability of a reasonable modification. The Court therefore will deny plaintiffs' summary judgment motion.

### C. Reasonable accommodation/Fundamental alteration

The above conclusion results in denial of plaintiffs' summary judgment motion. The

---

**38.** Whether the material is in an admissible form is yet another unanswered question.

**39.** Inasmuch as plaintiffs' motion for summary judgment is at issue, the Court does not have occasion to dismiss claims or parties on the basis of defendants' arguments. It appears that Warren B. may be unable to communicate whether he desires to live in the community. The facts pleaded in the third amended complaint, however, suggest that Warren B. has benefitted when he has been placed in a less restrictive setting. In some cases such a showing may satisfy the element of non-compulsion.

Court nonetheless will examine briefly the fundamental alteration defense to afford the parties some guidance as they proceed to trial.

First, the Court emphasizes to defendants that they bear the burden of proving fundamental alteration.[40] The reasonable accommodation regulation states: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless the public entity can demonstrate* that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(emphasis added). The regulation requires the "public entity" to "demonstrate" the fundamental alteration defense, and hence the burden of proof on this issue is squarely on defendants in this case. *Id. Olmstead* acknowledged this. 527 U.S. at 604, 119 S.Ct. 2176. This is also consistent with the allocation of burdens of proof in ADA Title II cases in general. *Vinson,* 288 F.3d at 1154. As such, to prevail on this defense defendants must do far more than make *arguments* such as that defendants are not motivated by the desire to keep institutions full,[41] or rely on a few statements by plaintiffs' purported expert, as they have done in their memorandum in opposition to plaintiffs' summary judgment motion. Rather, they must *demonstrate* that making the modifications would fundamentally alter the nature of the existing community-based service program. 28 C.F.R. § 35.130(b)(7). Failure to carry this burden could result in the entry of judgment in favor of plaintiffs. *See Kathleen S. v. Dept. of Pub. Welfare of Pa.,* 10 F.Supp.2d 460, 471 (E.D.Pa.1998).

Second, the Court emphasizes to plaintiffs that the fundamental alteration analysis entails far more than the comprehensive plan and reasonably paced waiting list example the *Olmstead* Court provided. *Olmstead* had much more to say about the defense than the cited example. In fact, the example is not actually an illustration of fundamental alteration at all. Rather, it is a way the State may show that it has *already* provided a reasonable accommodation. If the State makes this showing, then there is simply no need to further modify the program. As a corollary, if the State demonstrates a comprehensive plan and a reasonably paced waiting list, then there is no need for the State to prove that the requested modification would fundamentally alter the nature of the program.[42]

Here, defendants appear to concede that the State has no plan or waiting lists that move at a reasonable pace.[43] Al-

**40.** This assumes for the sake of discussion that plaintiffs would be able to make a threshold showing that a reasonable modification is available.

**41.** The Amicus brief similarly argues subjective lack of intent as a defense.

**42.** As a practical matter, if the parties dispute whether a comprehensive plan exists, and whether the list moves at a reasonable pace, a defendant likely would present evidence of the comprehensive plan and the pace of the list along with other evidence to support the fundamental alteration defense. In such a case, the Court could then weigh all of the evidence of the state's efforts along with the other factors in reaching its decision. *See Williams v. Wasserman,* 164 F.Supp.2d 591, 630–38 (D.Md.2001) (weighing the state's plan and the progress made in moving individuals from institutions to the community together with evidence concerning the cost of the proposed modification).

**43.** In light of developments since plaintiffs filed their summary judgment motion, defendants may now argue that they have a plan and that waiting lists move at a reasonable pace. As suggested in footnote 3, *supra,* the State has apparently applied for a significant number of additional waiver slots. The par-

though this is not a good thing for defendants, it does not necessarily mean that defendants cannot prevail. Unless defendants' position changes before this matter proceeds to trial, the Court's fact finding may focus on the fundamental alteration defense. The determination of the fundamental alteration defense will necessarily entail a complex fact-intensive inquiry, requiring the Court to weigh and balance at least the following factors set for in *Olmstead*'s sensible construction of the defense:

1. The resources available to the State;
2. The State's responsibility to care for and treat a large and diverse population of persons with mental disabilities, including those who will require services in an institutional setting;
3. Whether the relief plaintiffs seek would be inequitable given the above considerations.

*Olmstead*, 527 U.S. at 604, 119 S.Ct. 2176. The complexity of this issue is well illustrated in the decision of Judge Blake in *Williams v. Wasserman*, 164 F.Supp.2d 591, 630–38 (D.Md.2001). In *Williams*, a case factually similar to the case at bar, the court denied the parties' cross motions for summary judgment.[44] The court then conducted a thirty-two day bench trial, after which it issued an exhaustive memorandum decision. The court thoroughly examined the evidence presented at trial on the fundamental alteration defense under the principles set forth in *Olmstead*. *Williams*, 164 F.Supp.2d at 630–38. The *Williams* court considered a vast array of evidence, including the state's policy favoring community-based care, the state's gradual and continuous closing of institutions and expansion of community-based programs, the dramatic progress of the state's efforts, the state's participation in Medicaid waiver programs, the state's response to earlier litigation, the state's initiative in developing and funding community-based programs, expert testimony regarding the comparison of costs of community-based and institutional care, the state's fixed costs for institutional case and the cost of maintaining institutions while downsizing. *Id.* Ultimately, the court determined that given the cost of the proposed modification, and the progress the state was already making, plaintiffs' proposed modification would result in the fundamental alteration of the program, and accordingly entered judgment for the defendants. *Id.* at 637–38.

Another district court conducted a similarly thorough examination of evidence pertinent to the fundamental alteration defense in *Frederick L. v. Dept. of Pub. Welfare*, 217 F.Supp.2d 581 (E.D.Pa.2002). In *Frederick L.*, Judge Schiller issued detailed findings of fact concerning Pennsylvania's mental health budget, based in part on an apparently extensive stipulated record as well as a three-day bench trial. *See* 217 F.Supp.2d at 587–589. The court in *Frederick L.* concluded that Pennsylvania had established the fundamental alteration defense. *Id.* at 593.

In sum, if and when this case proceeds to trial, the Court expects the parties to be thoroughly prepared to present evidence addressing all of these facets of the fundamental alteration defense.

---

ties have not attempted to introduce evidence of any change in circumstances that could affect the outcome of the pending motions, and the Court must rely exclusively on the materials in the record in reaching its decision.

44. The West editorial introductory note erroneously states that the court granted summary judgment in favor of defendants.

## VI. Disposition

No one with a conscience and any sense of fundamental fairness would argue that mentally retarded and developmentally disabled people who are capable of living in the community should be kept in segregated institutions. In this regard, it is crucial to note that defendants are in no way opposed to providing such community-based services. They agree that it is a good thing, and they and their predecessors have instituted programs that provide community-based services, although not at the pace plaintiffs believe is required by federal law.

Defendants do, however, oppose the notion that a federal court may direct them as to when and how to provide such services, and they frame their opposition in terms of State sovereign immunity under the Eleventh Amendment to the U.S. Constitution. Although the Court ultimately rejects defendants' argument on this issue, defendants have every right to make it, and cannot be faulted for having done so.

In a larger sense, this case is, unfortunately, not as simple as deciding whether providing community-based services is a good idea. Government programs, federal and state, operate with limited resources, and these limited resources must be allocated in a manner that serves a wide variety of needs with fairness. Germane to this case, the U.S. Supreme Court has recognized that a state has a legitimate need to retain some institutions, as there will always be people who will need services in such settings, and hence a certain portion of the resources available to a state will always be directed to such institutions.

In a factually similar case, District Judge Blake of Maryland wisely observed, "[t]his case raises complex medical, social and fiscal issues not easily addressed by litigation." *Williams v. Wasserman,* 164 F.Supp.2d 591, 595 (D.Md.2001). Yet, Congress has spoken through the ADA, as interpreted by the U.S. Supreme Court in *Olmstead,* and difficult or not, this federal court cannot shrink from its duty to apply the law and reach conclusions on these profound issues. This decision provides a preliminary answer to but one issue: whether this case will proceed to trial. Plaintiffs have stated viable federal claims, and may proceed in this case to attempt to enjoin defendants to provide additional community-based services for individuals who are unnecessarily institutionalized. The Court also holds, however, that plaintiffs cannot prevail on their ADA claim solely on the basis of their written motion for partial summary judgment. Thus, unless the parties can reach a settlement, final resolution of this case will require a bench trial.

The Court continues firmly to believe that the best way to resolve this case would be by an agreement among the parties. The Court therefore encourages the parties to examine once again whether settlement is still possible.

Based on the above, the Court denies defendants' motion to dismiss in part and grants it in part (Doc. 336).

The Court denies plaintiffs' motion for partial summary judgment (Doc. 364).

The Clerk shall remove Doc. 336 and Doc. 364 from the Court's pending motions list.

Counsel shall contact the U.S. Magistrate Judge immediately to arrange a status conference under Fed.R.Civ.P. 16.

**IT IS SO ORDERED.**